[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15470

_____

D.C. Docket No. 3:16-cr-00093-TJC-JRK-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CORRINE BROWN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 6, 2021)

Before WILLIAM PRYOR, Chief Judge, WILSON, MARTIN, JORDAN, ROSENBAUM, NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges.*

WILLIAM PRYOR, Chief Judge, delivered the opinion of the Court, in which NEWSOM, BRANCH, GRANT, LUCK, LAGOA, and BRASHER, Circuit Judges, joined.

_____

* Judge Jill Pryor, having recused herself, did not participate in this en banc decision.

NEWSOM, Circuit Judge, filed a concurring opinion, in which GRANT, Circuit Judge, joined.

BRASHER, Circuit Judge, filed a concurring opinion, in which BRANCH, Circuit Judge, joined.

WILSON, Circuit Judge, filed a dissenting opinion, in which MARTIN, JORDAN, and ROSENBAUM, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a dissenting opinion, in which WILSON and MARTIN, Circuit Judges, joined.


WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether a district judge abused his discretion by removing a juror who expressed, after the start of deliberations, that the Holy Spirit told him that the defendant, Corrine Brown, was not guilty on all charges. The juror also repeatedly assured the district judge that he was following the jury instructions and basing his decision on the evidence admitted at trial, and the district judge found him to be sincere and credible. But the district judge concluded that the juror's statements about receiving divine guidance were categorically disqualifying. Because the record establishes a substantial possibility that the juror was rendering proper jury service, the district judge abused his discretion by dismissing the juror. The removal violated Brown's right under the Sixth Amendment to a unanimous jury verdict. We vacate Brown's convictions and sentence and remand for a new trial.

# I. BACKGROUND

In 2016, a federal grand jury indicted former Congresswoman Corrine Brown for several fraud, ethics, and tax offenses. It charged that Brown and two others conspired to defraud donors of more than $800,000 in contributions to a charitable organization that purported to provide scholarships to poor students. And it charged that Brown misused her position as a member of the United States House of Representatives in furtherance of the conspiracy. Brown demanded a trial by jury.

In 2017, ordinary citizens residing throughout the Jacksonville Jury Division of the Middle District of Florida assembled in the federal courthouse in Jacksonville and constituted a venire. For nearly three days, a magistrate judge and the parties selected jurors from the venire for Brown's trial. During voir dire, the magistrate judge asked the prospective jurors several questions about their qualifications to serve. Among these questions he asked, "Do any of you have any political, religious, or moral beliefs that would preclude you from serving as a fair, impartial juror in this case?" Juror No. 13 did not raise his hand. The magistrate judge also asked, "Do any of you have any religious or moral beliefs that you believe would preclude you from serving as a juror because . . . it would involve sitting in judgment of another person?" Again, Juror No. 13 did not raise his hand.

3

When jurors were selected and seated, the courtroom deputy administered the traditional oath to the jury: "Do each of you solemnly swear that you will well and truly try the case now before this court and render a true verdict, according to the law, evidence, and instructions of this court, so help you God?" Juror No. 13 swore he would.

Trial began. The parties presented witnesses and evidence for eight days. The jury heard closing arguments for and against conviction.

The district judge next delivered the charge to the jury. He instructed the jurors that their decision "must be based only on the evidence presented during the trial." By "evidence," he meant "the testimony of witnesses and the exhibits admitted." And it was incumbent upon the jurors to decide whether each piece of evidence was "true or accurate" and whether to "believe what each witness had to say."

The district judge instructed each juror that he was required to "follow the law as [he] explain[ed] it—even if [the juror did] not agree with the law." No juror could "single out or disregard any of the court's instructions on the law." The jury had to "follow all of [the] instructions as a whole."

"The law presumes every defendant is innocent," the judge reminded these jurors. And he explained that the government bore the burden of proving Brown's "guilt beyond a reasonable doubt" as to each of the charges against her. He

4

clarified what that familiar phrase meant: that the government's proof "ha[d] to exclude any 'reasonable doubt'"—that is, "a real doubt, based on [each juror's] reason and common sense after [he had] carefully and impartially considered all the evidence in the case"—of her guilt. The proof had to be "so convincing that [each juror] would be willing to rely and act on it without hesitation in the most important of [his] own affairs." "If you are not convinced," the judge told the jurors, "say so."

Each juror had to "decide the case for [himself]," the judge continued, "but only after fully considering the evidence with . . . the other jurors." The jurors were required to "discuss the case with one another and try to reach an agreement." The judge told each juror not to "hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong" as the jurors deliberated. "But," he said, "don't give up your honest beliefs just because others think differently." Each juror was a judge of the facts whose task was "to seek the truth from the evidence in the case."

The jury left the courtroom to begin its deliberations that afternoon. Deliberations, as far as the judge could tell, "progress[ed] smoothly." But an unusual situation arose the next day.

On the evening of the second day of deliberations, Juror No. 8 called the courtroom deputy to express concerns that another juror was talking about "higher

5

beings." Juror No. 8 "said that she was calling on her own behalf, but thought that other jurors were concerned as well." The deputy promised to inform the judge, who brought the issue to the parties' attention overnight.

The next morning, the judge conferred with the parties about how to proceed. He observed that, unlike in cases where a dismissal of a deliberating juror was affirmed, there was no suggestion of any problems with deliberations. The parties thought more information was needed, and the judge reluctantly agreed. So he followed their suggestion to interview Juror No. 8.

In a sealed courtroom, Juror No. 8 identified Juror No. 13 as the subject of her concerns. She offered the judge a letter that expressed her concerns about Juror No. 13's speaking of divine guidance regarding Brown's innocence:

> Your Honor
>
> With all due respect, I'm a little concerned about a statement made by Juror #13 when we began deliberation. He said "A Higher Being told me Corrine Brown was Not Guilty on all charges". He later went on to say he "trusted the Holy Ghost". We all asked that he base his verdict on the evidence provided, the testimony of the witnesses and the laws of the United States court. Other members of the Jury share my concern.
>
> Thank You,
>
> Juror #8

6

The judge asked Juror No. 8 to elaborate on Juror No. 13's statements, and Juror No. 8 explained that the statements were made only at the beginning of deliberations:

> THE COURT: When were those comments made?
>
> JUROR [No. 8]: The first one was when we first went into deliberation. . . . And the second one, shortly after, maybe within a few hours after.

But Juror No. 8 then explained that the jury had been deliberating without any problem afterward:

> THE COURT: Has this juror expressed that view again?
>
> JUROR [No. 8]: No, sir.
>
> THE COURT: To your observation, has that juror been deliberating?
>
> JUROR [No. 8]: Yes.
>
> THE COURT: Is there anything about the situation as it stands right now that's interfering with your ability to deliberate in the way that the court has directed in the instructions?
>
> JUROR [No. 8]: No, sir. Not at all. I was more concerned that it was going to interfere in his ability to do that.

After the government asked for clarification about the timing of the second comment, the judge confirmed the timing and similarity of Juror No. 13's statements:

> THE COURT: Okay. Ma'am, you said that this comment was made twice. Was the comment similar both times?

7

JUROR [No. 8]: Yes. And it was—yes.

THE COURT: Okay. All right. And when was the—the first comment you said was shortly after deliberations began; is that correct?

JUROR [No. 8]: The first comment is basically right when deliberation began.

THE COURT: And then when in point of time was the second comment?

JUROR [No. 8]: That same day, just maybe a couple of hours after.

THE COURT: And has that comment—and I think I've asked you this. But has this juror repeated that comment or anything similar to that since then?

JUROR [No. 8]: No, sir, but other jurors have.

THE COURT: I don't know what you mean by that.

JUROR [No. 8]: Some of the jurors are concerned that that's affecting his—his decision.

The judge paused to ask if the parties thought he should ask anything else.

At Brown's request, the judge confirmed that Juror No. 8 decided on her own to contact the courtroom deputy and that the other jurors expressed their concern only during the deliberations:

THE COURT: All right. Ma'am, did you decide to call [the courtroom deputy] on your own? Or did anybody suggest you do so?

JUROR [No. 8]: No, sir. I made that decision. I don't think any of [the other jurors] are even aware that I did that.

8

THE COURT: Okay. And the second question is—you referenced in your last answer that other jurors have expressed concerns. Is that during the course of deliberations, or is that outside of deliberations?

JUROR [No. 8]: It was all in—during deliberations.

THE COURT: Thank you, ma'am.

JUROR [No. 8]: With him present.

Juror No. 8 returned to the jury room. The judge circulated Juror No. 8's letter among counsel, and they all discussed what to do next. The government suggested questioning the foreperson to see if any other jurors shared Juror No. 8's concerns, but Brown argued against further inquiry at that point because there was no "indication that [Juror No. 13] is not fulfilling his responsibilities for deliberating." After all, Brown argued, Juror No. 8 did not represent that Juror No. 13 was "refusing to discuss the evidence" or "saying that no matter what the evidence is he's going to reach a particular result."

The judge decided to question Juror No. 13. He wanted to find out whether Juror No. 13 had simply "pray[ed] for guidance," which he would not view as a problem, or was "raising some religious view that would prevent him from ever determining . . . that Ms. Brown was guilty on charges," which would be "problematic." The judge and the parties agreed that the questions the judge asked Juror No. 13 should "go from general to more specific." With that approach in mind, the judge called Juror No. 13 to the courtroom.

9

The judge began by "repeat[ing] the question" about religious beliefs that impede jury service "that [the magistrate judge] asked during voir dire," and Juror No. 13 reaffirmed his previous response that he could base his decision on the law and the evidence without difficulty:

> THE COURT: Do you remember back when you were selected for the jury that one of the questions . . . was whether you had any political, religious, or moral beliefs that would preclude you from serving as a fair and impartial juror in this case?
>
> Do you remember that question?
>
> JUROR [No. 13]: I do.
>
> THE COURT: Okay. And I assume at that time you answered that question no, is that right, that you did not—
>
> JUROR [No. 13]: That is correct.
>
> THE COURT: Okay. And is that—is that still the case? Are you having any difficulties with any religious or moral beliefs that are, at this point, bearing on or interfering with your ability to decide the case on the facts presented and on the law as I gave it to you in the instructions?
>
> JUROR [No. 13]: No, sir.

The judge then asked the juror whether he was deliberating, and the juror began to tell him that the jury was reviewing the evidence in the jury room:

> THE COURT: Okay. Do you consider yourself to have been deliberating with your other jurors according to the law and the instructions that the court gave to you before you went in to deliberate?
>
> JUROR [No. 13]: We have been going over all the individual numbers, as far as—

10

The judge interrupted. He "d[id not] want to hear anything about the deliberations."

The judge reframed the question to find out if Juror No. 13's religious beliefs were interfering with his ability to render proper jury service, and the juror explained that he had been following the evidence:

> THE COURT: But I'm just asking you. Are you—do you consider yourself to be following the court's instructions, in terms of the law and how you go about what you're doing, free from any influence of religion or political or moral beliefs?
>
> Are you able to do that? Have you been doing that?
>
> JUROR [No. 13]: I've been following—I've been following and listening to what has been presented and making a determination from that, as to what I think and believe.

"That's fine," commented the judge.

The judge then asked whether Juror No. 13 made the statements Juror No. 8 reported, but reframed his question multiple times as he asked it, making it difficult to know exactly what Juror No. 13 confirmed:

> THE COURT: Have you expressed to any of your fellow jurors any religious sentiment, to the effect that a higher being is telling you how—is guiding you on these—on these decisions, or that you are trusting in your religion to—to base your decisions on?
>
> Have you made any—can you think of any kind of statements that you may have made to any of your fellow jurors along those lines?
>
> JUROR [No. 13]: I did, yes.

11

Having received an affirmative response, the judge asked Juror No. 13

precisely what he told the other jurors. Juror No. 13 explained that he had been

listening to the evidence and "for the truth":

> THE COURT: Okay. Can you tell me, as best you can, what you said?
>
> JUROR [No. 13]: Absolutely. I told them that in all of this, in listening to all the information, taking it all down, I listen for the truth, and I know the truth when the truth is spoken. So I expressed that to them, and how I came to that conclusion.

The judge asked Juror No. 13 to clarify whether he spoke to the other jurors

in terms of "a higher power or a higher being," and Juror No. 13 confirmed that he

had prayed for and received guidance:

> THE COURT: Okay. And in doing so, have you invoked a higher power or a higher being? I mean, have you used those terms to them in expressing yourself?
>
> JUROR [No. 13]: Absolutely. I told—I told them that—that I prayed about this, I have looked at the information, and that I received information as to what I was told to do in relation to what I heard here today—or this past two weeks.

On further questioning, Juror No. 13 again explained that he had prayed for

and received divine guidance:

> THE COURT: Sure. When you say you received information, from what source? I mean, are you saying you received information from—
>
> JUROR [No. 13]: My Father in Heaven.
>
> THE COURT: Okay. Is it a fair statement—I don't want to put words in your mouth. But are you saying that you have prayed about this and

12

that you have received guidance from the Father in Heaven about how you should proceed?

JUROR [No. 13]: Since we've been here, sir.

When the judge reminded Juror No. 13 about his responses about his religious beliefs during voir dire, Juror No. 13 again assured the judge he was following the jury instructions:

> THE COURT: Do you view that in any way—as you know, when I instructed you, I, as I do for—for all juries—you had told [the magistrate judge] that you had no religious or any—you did not have any religious or moral beliefs that would preclude you from serving as a fair and impartial juror, nor did you have any religious or moral beliefs that would preclude you from sitting in judgment of another person. . . . And then you also—of course, you heard my instruction, where you have to base your decision only on the evidence presented during the trial and follow the law as I explained it. Do you feel that you have been doing that?
>
> JUROR [No. 13]: Yes, sir, I do.

When the judge pressed the juror about a possible conflict between his religious beliefs and proper jury service, Juror No. 13 insisted there was none and explained that his religious beliefs instead required him to follow the judge's instructions:

> THE COURT: Do you feel that there is any inconsistency in the prayer that you've had or the guidance you're receiving and your duty to base your decision on the evidence and the law?
>
> JUROR [No. 13]: You said a few—you said a few things. Repeat, please.

13

THE COURT: Do you feel that there's any religious tension, or is your religion and your obvious sincere religious beliefs—do you believe it at all to be interfering with or impeding your ability to base your decision solely on the evidence in the case and following the law that I've explained to you?

JUROR [No. 13]: No, sir. I followed all the things that you presented. My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room.

The judge sent Juror No. 13 to the jury room for a moment and conferred with the parties. The judge decided he would ask Juror No. 13 directly about the statement Juror No. 8 reported in her note. The judge agreed with the government, "if he says he said it, then he said it," and "that probably is an improper religious intrusion into the deliberative process."

The judge called Juror No. 13 back into the courtroom. The judge asked him about the alleged statement, and Juror No. 13 confirmed he said it at the beginning of deliberations:

THE COURT: So what I want to ask you is a fairly direct question, and that is this: Did you ever say to your fellow jurors or to a fellow juror during your—during the time that y'all worked together, when the 12 started, something to this effect, ["]A higher being told me that Corrine Brown was not guilty on all charges["]? Did you say something like that? Did you say that or something like that to any of your fellow jurors?

JUROR [No. 13]: When we were giving why we were—insight, as far as not guilty or whatever for the first charge, yes.

THE COURT: Did you say the words, ["]A higher being told me that Corrine Brown was not guilty on all charges["]?

14

JUROR [No. 13]: No. I said the Holy Spirit told me that.

THE COURT: Okay. And you—and I don't want to get into your deliberations. But at what point in the deliberations was that? Was it at the beginning? Was it early in the deliberations? When was it?

JUROR [No. 13]: I mentioned it in the very beginning when we were on the first charge.

The judge stopped the interview. In a sidebar conference, the government insisted that Juror No. 13's comment to his fellow jurors "c[ould not] be rehabilitated at all," but Brown thought the judge should ask him whether "he[ was] able to follow the court's instructions and ha[d] he been doing so." The judge noted he had already asked that question and the government thought he should not repeat it. The judge declined to ask any additional questions and Juror No. 13 left the courtroom. At that point, the government moved to dismiss Juror No. 13. Brown objected that the "threshold to discharge the juror" had not been reached.

The judge decided to remove Juror No. 13 and gave his reasons for doing so. He "recognize[d]" that Juror No. 13 had not "specifically said [that he would not] follow the law." "In fact," the judge acknowledged, "Juror No. 13 has said he's trying to do that and . . . feels that he is applying the court's instructions properly." Indeed, he found Juror No. 13 was "very earnest" and "very sincere," and he was

15

sure that the juror "believe[d] that he [was] trying to follow the court's instructions . . . [and] rendering proper jury service."

In spite of Juror No. 13's assurances and sincerity, the judge explained that the dismissal was warranted because, "upon inquiry and observ[ation]" of the juror, there was "no question" that the juror said "[a] higher being told me Corrine Brown was not guilty on all charges" and made statements about "receiving information from a higher authority as part of his deliberative process." He reasoned that "a juror who makes that statement to other jurors and introduces that concept into the deliberations"—"especially . . . very early in the deliberations"—"is a juror that is injecting religious beliefs that are inconsistent with the instructions of the court."

He determined that "by definition" the juror was not someone "praying for guidance" to "be enlightened," but someone being "direct[ed] or t[old] . . . what disposition of the charges should be made" by "the higher being" or "Holy Spirit." So, "based upon [the judge's] reading of the case law in other cases where religious beliefs have caused a juror to be struck," Juror No. 13's statement, which "he forthrightly admitted to," "is a disqualifying statement."

The judge also stated that "looking and judging the credibility of Juror No. 13, . . . he was hesitant at first to explain . . . how his religious views ha[d] come to the fore during deliberations." The judge again "dr[ew] a distinction

16

between someone . . . praying for guidance or seeking inspiration" and Juror

No. 13, who "actually [said] that an outside force, that is, a higher being, a Holy

Spirit, told him that Ms. Brown was not guilty on those charges."

"[T]he record is clear," said the judge. "[N]ot only did Juror No. 13 make

this statement, but it appear[ed] that he continue[d] to believe that he [was] being

told by a higher power how he ought to proceed in these deliberations, and he

ha[d] shared that with the other jurors. . . ." By holding this belief, Juror No. 13

"violat[ed] the court's instructions to base the decision only on the law and the

facts that were adduced at trial." So the judge found "beyond a reasonable doubt"

that there was "no substantial possibility that [Juror No. 13 was] able to base his

decision only on the evidence and the law" and that the juror was "using external

forces to bring to bear on his decision-making in a way that[ was] inconsistent with

his jury service and his oath."

The judge replaced Juror No. 13 with an alternate and instructed the jury to

begin its deliberations anew. The following day, the reconstituted jury reached a

verdict. It found Brown guilty of 18 counts and not guilty of four counts.

Brown moved for a new trial based on the dismissal of Juror No. 13. The

judge denied the motion. He reiterated that the "colloquy with Juror No. 13

revealed him to be sincere and earnest" and that "Juror No. 13 likely believed that

he was trying to follow[] the Court's instructions." But the judge found that Juror

No. 13 "seemed unaware of the inconsistency" between the juror's assurances and his "religious beliefs [that] compelled him to disregard those instructions and instead follow direction from the 'Holy Spirit' to find the defendant 'not guilty on all charges,'" "reinforcing [the judge's] belief that he would be unable to follow the Court's instructions." He emphasized that Juror No. 13 "had expressed a conclusion from the beginning of the deliberations and without discussion with his fellow jurors." And he stressed that "Juror No. 8 was concerned enough that she contacted the courtroom deputy by phone at night" and reported that "other jurors were concerned."

The judge again acknowledged that, "[h]ad Juror No. 13 simply stated to his fellow jurors that he was praying for guidance during the deliberations, that would not have been problematic." But Juror No. 13 instead "announced at the beginning of deliberations that he was following instructions from an outside source, which is not permitted, even when that source derives from one's own religious beliefs." Although "[d]ismissing a deliberating juror is not done cavalierly," the judge explained that the requisite threshold to do so was met.

After the judge sentenced Brown, this appeal followed. We vacated a panel decision affirming Brown's convictions and decided to rehear this appeal en banc. *See United States v. Brown*, 947 F.3d 655 (11th Cir.), *vacated*, *reh'g en banc granted*, 976 F.3d 1233 (11th Cir. 2020).

18

## II. STANDARDS OF REVIEW

"A district court's decision to remove a juror is reviewed for abuse of discretion." *United States v. Augustin*, 661 F.3d 1105, 1129 (11th Cir. 2011). "We will reverse the district court only if we find that it discharged the juror without factual support, or for a legally irrelevant reason." *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001) (alteration rejected) (internal quotation marks omitted). We review factual findings for clear error, *id.* at 1303, in the light of the "applicable standard of proof," *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622–23 (1993). Clear error exists if after reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

## III. DISCUSSION

We divide our analysis in two parts. First, we discuss the high thresholds that must be met to dismiss a deliberating juror and to affirm a dismissal, as required by the Sixth Amendment. Second, we consider whether the evidence before the district judge regarding Juror No. 13 satisfied the demanding standard of proof. We conclude it did not.

19

### A.  A Rigorous Standard Protects the Right of the Accused to a Unanimous Jury Verdict.

The Anglo-American legal tradition has regarded few rights as more sacred than that of a criminal defendant to be tried by a jury of her peers. To Blackstone, that a defendant's conviction could be secured only "by the unanimous consent of twelve of [her] neighbours and equals" was "the glory of the English law," "the most transcendent privilege," and "[a] constitution, that . . . ha[d], under providence, secured the just liberties of [the English] nation for a long succession of ages." 3 William Blackstone, *Commentaries* *379. And Matthew Hale wrote that "the law of England hath afforded the best method of trial, that is possible, . . . namely by a jury . . . all concurring in the same judgment." 1 Matthew Hale, *The History of the Pleas of the Crown* 33 (1736) (emphasis omitted).

The Founding generation thought the right to a jury in a criminal trial so precious that it enshrined it in the Constitution twice. *See* U.S. Const. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); *id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). And the Supreme Court has confirmed that the Constitution requires a jury to reach a unanimous guilty verdict to convict. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020).

20

The right of trial by jury "is no mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 305–06 (2004); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2238 (2019) ("Other than voting, serving on a jury is the most substantial opportunity that most citizens have to participate in the democratic process."). "The institution of the jury raises the people itself . . . to the bench of judicial authority and invests [them] . . . with the direction of society." *Powers v. Ohio*, 499 U.S. 400, 407 (1991) (alterations adopted) (quoting Alexis de Tocqueville, 1 *Democracy in America* 334 (Henry Reeve trans., Schocken 1st ed. 1961)). Trial by jury "preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people"—that is, "ordinary citizens." *Id.* (internal quotation marks omitted).

In particular, "[t]he jury trial right protects [defendants] from being judged by a special class of trained professionals who do not speak the language of ordinary people and may not understand or appreciate the way ordinary people live their lives." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 874–75 (2017) (Alito, J., dissenting). "Jurors *are* ordinary people. They are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives. Our

21

Constitution places great value on this way of thinking, speaking, and deciding." *Id.* at 874 (emphasis added).

The jury system protects the accused by establishing a critical division of labor between the judge and the jury. Although the judge's role is "to instruct the jury on the law and to insist that the jury follow his instructions," it remains "the jury's constitutional responsibility" both "to determine the facts" and "to apply the law to those facts [to] draw the ultimate conclusion of guilt or innocence." *United States v. Gaudin*, 515 U.S. 506, 513–14 (1995). As an inaugural justice of the Supreme Court insisted long ago, "[i]t is of the greatest consequence . . . that the powers of the judges and jury be kept distinct: that the judges determine the law, and that the jury determine the fact. This well-known division between their provinces has been long recognised and established." 2 James Wilson, *Lectures on Law*, *in The Works of the Honourable James Wilson* 371 (Bird Wilson ed., Phila., Lorenzo Press 1804).

Because our jury system works only when both the judge and the jury respect the limits of their authority, a district judge may excuse a juror after deliberations have begun only on a finding of "good cause." *See* Fed. R. Crim. P. 23(b)(3). It is well settled that good cause "exists to dismiss a juror when that juror refuses to apply the law or to follow the court's instructions." *Abbell*, 271 F.3d at 1302. Such a juror abdicates his "constitutional responsibility," *Gaudin*,

22

515 U.S. at 514, and violates his solemn oath, *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006). But "to remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict." *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997). Distinguishing between these two jurors is "often difficult," *id.*, as the line between them "can be vanishingly thin," *United States v. McIntosh*, 380 F.3d 548, 556 (1st Cir. 2004).

To guard against "the danger that a dissenting juror might be excused under the mistaken view that the juror is engaging in impermissible nullification," we apply "a tough legal standard" for the dismissal of jurors during deliberations. *Abbell*, 271 F.3d at 1302. Along with four of our sister circuits, we have held that, "[i]n these kind[s] of circumstances, a juror should be excused only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence." *Id.* (citing *Thomas*, 116 F.3d at 621–22; *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987)); *accord United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007); *United States v. Symington*, 195 F.3d 1080, 1087 & n.5 (9th Cir. 1999). We have explained that "this standard [is] basically a 'beyond reasonable doubt' standard." *Abbell*, 271 F.3d at 1302.

So, for a district judge to find that this standard of proof is satisfied, he must determine "with utmost certainty" that a juror has refused to base his verdict on the law as instructed and the evidence admitted at trial. *In re Winship*, 397 U.S. 358,

23

364 (1970). "[A] lower evidentiary standard could lead to the removal of jurors on the basis of their view of the sufficiency of the prosecution's evidence," *Thomas*, 116 F.3d at 622, rendering a defendant's right to a unanimous jury verdict "illusory," *Brown*, 823 F.2d at 596. "The courts must in all cases guard against the removal of a juror—who aims to follow the court's instructions—based on his view on the merits of a case." *Thomas*, 116 F.3d at 622 n.11.

Although a district judge applies the same high standard of proof to dismiss a deliberating juror that a jury applies to convict a defendant, our review of their decisions is starkly different—and with good reason. When we evaluate a challenge to the sufficiency of the evidence supporting a conviction, "we must view the evidence in the light most favorable to the government, drawing all reasonable inferences in favor of the jury's verdict." *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995) (internal quotation marks omitted). And we consider only a "legal" question: whether "*any* rational trier of fact" could have found that the evidence established guilt beyond a reasonable doubt. *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (internal quotation marks omitted); *see also United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc). We leave a jury "free to choose between or among the reasonable conclusions to be drawn from the evidence." *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007) (internal quotation marks omitted). This "limited review does not

24

intrude on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Musacchio*, 136 S. Ct. at 715 (internal quotation marks omitted). After all, jurors are the "sole judges of the facts." *United States v. Smith*, 700 F.2d 627, 634 (11th Cir. 1983) (internal quotation marks omitted).

But we do not afford the same deference to the dismissal of a deliberating juror—an alleged *constitutional* error. On this review, we examine the record to ensure that "*no* substantial possibility" existed that the dismissed juror was rendering proper jury service, *Abbell*, 271 F.3d at 1302 (emphasis added) (internal quotation marks omitted), instead of looking to confirm that at least *a* substantial possibility existed that the juror was committing misconduct. Otherwise, we would turn our "tough" standard on its head, *id.*, and a constitutional violation might evade detection.

Without that tough standard, we would risk erosion of a fundamental safeguard against "being judged by a special class." *Peña-Rodriguez*, 137 S. Ct. at 875 (Alito, J., dissenting). We must remember that "the Federal Judiciary is hardly a cross-section of America." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2629 (2015) (Scalia, J., dissenting). A district judge, who belongs to a select class of highly educated professionals, might remove a juror by honestly misinterpreting the juror's language as proof of misconduct, and thereby substitute his own judgment

25

in place of the ordinary citizen's. *See Thomas*, 116 F.3d at 622 (explaining that a judge "faced with ambiguous evidence" might "wind up taking sides in disputes between jurors on allegations of juror nullification," effectively "interfer[ing] with, if not usurp[ing], the fact-finding role of the jury"). And appellate judges, no less part of that select class, might easily make that same mistake. So we require that only an unambiguous record may withstand reversal.

The persuasive authorities we invoked in *Abbell* instruct us that reversal is warranted on an ambiguous record even when substantial evidence supports the conclusion that a dismissed juror was basing his decision on impermissible grounds. In those leading cases, our sister circuits decided that the trial courts were wrong to dismiss jurors whose references to the evidence in explaining their positions left open a substantial possibility that they were willing and able to discharge their duties. *Thomas*, 116 F.3d at 623–24; *Brown*, 823 F.2d at 596–97. Because we expressly adopted the D.C. and Second Circuits' standard, *Abbell*, 271 F.3d at 1302–03 & nn.14, 17, their opinions help guide us.

In *Brown*, the juror himself requested that the district judge dismiss him and informed the district judge that he was "not able to discharge [his] duties," that he "would have not said [he] could be impartial" if he "had known at the beginning . . . what the act [at issue] said," and that he "disagree[d] with" the law. 823 F.2d at 594 (internal quotation marks omitted). But the juror also said that "[i]f the

26

evidence [had been] presented in a fashion in which the law is written, then, maybe, [he] would be able to discharge [his] duties." *Id.* And he told the court that he was concerned with "the way the act is written *and* the way the evidence ha[d] been presented." *Id.* at 597 (alterations adopted). With that "ambiguous record" before it, the D.C. Circuit concluded that his dismissal violated the accused's right to a unanimous jury verdict. *Id.*

In *Thomas*, several jurors reported that the suspect juror had invoked legally irrelevant reasons for favoring acquittal and was being disruptive during deliberations. 116 F.3d at 611. Others disagreed—one juror even told the judge that "the other jurors were in fact 'picking on' [the suspect juror]." *Id.* The district judge dismissed the juror because he "believe[d]" that the juror was refusing to convict "because of preconceived, fixed, cultural, economic, or social reasons." *Id.* at 612 (alterations adopted) (internal quotation marks omitted). But a reasonable possibility existed that the suspect juror's position stemmed from his view of the sufficiency of evidence. *Id.* at 624. The juror "assured the [district judge] that his vote was based on his view of the evidence," as corroborated by multiple jurors who reported that the juror "couch[ed] his position in terms of the evidence." *Id.* at 611, 623. With an ambiguous record before it, the Second Circuit reversed. *Id.* at 623–24.

27

Our precedents are instructive too. In each of our decisions approving the dismissal of a dissenting juror, the district judge received unambiguous information from the juror herself about her unwillingness or inability to follow the law, *see United States v. Geffrard*, 87 F.3d 448, 451, 453–54 (11th Cir. 1996); credible complaints of misconduct corroborated by all of the other jurors, *see United States v. Godwin*, 765 F.3d 1306, 1315 (11th Cir. 2014); *Abbell*, 271 F.3d at 1303–04 & n.18; or a combination of both, *see United States v. Oscar*, 877 F.3d 1270, 1285–86 (11th Cir. 2017); *Augustin*, 661 F.3d at 1129–32. In each of these appeals, the only reasonable construction of the record mandated the dismissal.

Of course, we do not mean to suggest that a district judge should ordinarily interview several jurors or conduct a lengthy investigation of alleged juror misconduct. Our high standard "protect[s] against overly intrusive judicial inquiries into the substance of the jury's deliberations." *Thomas*, 116 F.3d at 622. "A presiding judge faced with anything but unambiguous evidence that a juror [is engaging in misconduct] need go no further in his investigation" of the alleged misconduct and must not dismiss that juror. *Id.* With this rule, we protect "the twin imperatives of preserving jury secrecy and safeguarding the defendant's right to a unanimous verdict from an impartial jury." *Symington*, 195 F.3d at 1087.

Before we delve into the record before us, we reject the government's insistence that on clear error review, we must defer to the district judge's decision.

Contrary to the government's assertions, this appeal is not one that turns on demeanor or credibility determinations, for which "our deference" to a district judge is "at its pinnacle." *United States v. Sammour*, 816 F.3d 1328, 1338 (11th Cir. 2016) (internal quotation marks omitted). Here, the district judge found that Juror No. 13 was "very earnest" and "very sincere." And he found that "upon . . . observing" the juror, that is, his demeanor, there was "no question" that he made the supposedly problematic statements—indeed, the juror "readily admitted" as much. These credibility determinations are not contested on appeal.

The district judge did not base his dismissal on a finding that Juror No. 13 was being deceptive about following the jury instructions. The district judge was "sure" that the juror "believe[d] that he [was] rendering proper jury service." Instead, he removed the juror because the juror "expressed views and h[eld] views" that were, according to the judge, "by definition" "inconsistent with his sworn duty as a juror," just like religious views that do not permit "sit[ting] in judgment of others." And that conclusion was based on his finding, if it can be called one at all, that Juror No. 13 was being "direct[ed] . . . what disposition of the charges [to] ma[ke]" and "using external forces to bring to bear on his decision-making."

To the district judge, Juror No. 13's religious statements were conclusive proof that he was not "bas[ing his] decision only on the law and the facts that were adduced at trial" or "able to deliberate" properly. That finding is not a credibility

29

determination for which the district judge has a "superior vantage point" and to which we owe special deference. *Id.* If, upon examining all of Juror No. 13's statements, we are left with the "definite and firm conviction" that the district judge was mistaken in finding that no substantial possibility remained that he was rendering proper jury service, *U.S. Gypsum Co.*, 333 U.S. at 395, then the district judge abused his discretion by dismissing him.

### B. There Was a Substantial Possibility that Juror No. 13 Was Fulfilling His Duty to Render a Verdict Based on the Evidence and the Law.

Our precedent requires us to evaluate whether a substantial possibility—that is, "a tangible possibility, not just a speculative hope"—existed that Juror No. 13 was basing his decision only on the evidence and the law. *Abbell*, 271 F.3d at 1302 n.14. We ask whether Juror No. 13's religious statements amounted to proof beyond a reasonable doubt that he could not render a verdict based solely on the evidence and the law, thereby disqualifying him, despite substantial evidence that he was fulfilling the duty he had sworn to render. They did not.

To begin, Juror No. 13 expressed a clear understanding of proper jury service. He confirmed that understanding when he recounted to the judge, "that in all of this, in listening to all the information, taking it all down, I listen for the truth, and I know the truth when the truth is spoken." Without prompting, Juror No. 13 used his ordinary language to describe the traditional role of a juror—to listen to the evidence adduced at trial, determine whether testimony is credible,

30

find the required facts, apply the law to those facts, and render a verdict based on those facts. *See Gaudin*, 515 U.S. at 514–15. And significantly, this explanation reflected the district judge's earlier instructions "to seek the truth from the evidence in the case."

Juror No. 13 *never* gave any indication that he was refusing to consider the evidence or follow the law. None of Juror No. 13's statements suggested that he "c[ould not] go along with" or "disagree[d] with the law." *Brown*, 823 F.2d at 594; *see also United States v. Wilkerson*, 966 F.3d 828, 833–35 (D.C. Cir. 2020) (affirming dismissal of juror who asked to be removed because she "strongly disagree[d] with the laws and instructions" (internal quotation marks omitted)); *Augustin*, 661 F.3d at 1130–32 (affirming dismissal of juror who, according to other jurors, said she "d[id not] believe in the law" and "d[id not] trust the law" (internal quotation marks omitted)). Nor did Juror No. 13 express any lack of faith in the justice system or admit he could not be fair. *Cf. Oscar*, 877 F.3d at 1285–86 (affirming dismissal of juror who admitted to the court and other jurors that she was not following the law, could not be fair, and questioned the justice system); *Kemp*, 500 F.3d at 276–77, 304–05 (affirming dismissal of juror who most jurors said expressed bias against the government and who other jurors said was not considering the evidence). But even in *Brown*, where the suspect juror expressed disagreement with the law, other statements that evidenced proper jury service

31

created a sufficiently ambiguous record to reverse the juror's dismissal. *See* 823 F.2d at 596–97.

The record establishes that Juror No. 13 repeatedly referred to the evidence in explaining his deliberative process. When the district judge asked if he "consider[ed] [him]self to have been deliberating with [the] other jurors," Juror No. 13 began to explain that he and the other jurors had "been going over all the individual numbers," a reference to their review of the evidence, but the judge cut him off and clarified that he should speak only generally. Then, in his own words, the juror explained that he was basing his decision on the evidence: "I've been following and listening to what has been presented and making a determination from that, as to what I think and believe."

To be sure, a juror might *say* that he is deliberating and explain his decision-making in terms of the evidence, when he is in fact not following the jury instructions. But a district judge cannot conclude that a juror is dissembling—even unwittingly so—without a factual foundation. In previous cases where dismissal has been proper, the district judge determined that the juror was not telling the truth by confirming with all other jurors that the suspect juror was refusing to deliberate or base her verdict on the evidence and the law alone. *See, e.g.*, *Augustin*, 661 F.3d at 1129–34. Not so here.

32

Juror No. 13's assurances that he was deliberating were supported, not contradicted, by the only other juror the district judge interviewed. When asked, Juror No. 8 confirmed as much to the district judge. Unlike several jurors in *Thomas*, she did not report that Juror No. 13 was ignoring the evidence, refusing to deliberate, or obstructing the jury's deliberation in any way. *See* 116 F.3d at 611–12; *cf. United States v. Fattah*, 914 F.3d 112, 141–43, 147 (3d Cir. 2019) (affirming dismissal of juror who admitted yelling at other jurors, who other jurors said placed his hand on another juror, and who told the courtroom deputy he was "going to hang this jury" (internal quotation marks omitted)). And even then, the Second Circuit reversed the juror's dismissal because the evidence of misconduct was mixed. *Thomas*, 116 F.3d at 623–24; *see also McIntosh*, 380 F.3d at 551–52, 556 (finding that "ample evidence . . . support[ed] the district court's decision not to jettison" the "lone holdout for acquittal" who other jurors reported "had been interrupting the deliberations" and "had made up his mind before deliberations began and would not budge" but who "vouchsafed" he was deliberating with the other jurors over the evidence). Moreover, the district judge himself stated that deliberations were, as far as he could tell, proceeding "smoothly."

No juror reported that Juror No. 13 had engaged in any misconduct. Juror No. 8 expressed only vague "concern[]" that Juror No. 13's beliefs *might later* "interfere in his ability" to deliberate. And although Juror No. 8 said that other

33

jurors expressed concern that Juror No. 13's beliefs were "affecting his . . . decision," only Juror No. 8 alerted the judge about his statements. In the absence of any evidence that Juror No. 13 was ignoring the evidence or refusing to deliberate, we must "guard against the removal of a juror—who aims to follow the court's instructions—based on his view on the merits of a case." *Thomas*, 116 F.3d at 622 n.11.

Juror No. 8's decision to report Juror No. 13's statements, and the other jurors' supposed concern, could have stemmed from Juror No. 13's initial inclination to acquit Brown. After all, jurors often disagree in their deliberations. The Ninth Circuit, for instance, reversed the dismissal of a juror with an entrenched view that a defendant was innocent because evidence suggested that "the other jurors' frustrations with her," including their doubts about her ability to deliberate, "derived primarily from the fact that she held a position opposite to theirs on the merits of the case." *Symington*, 195 F.3d at 1083–84, 1088; *see also McIntosh*, 380 F.3d at 556 ("In the absence of unambiguous evidence that a juror is attempting to thwart the deliberative process, we believe the wisest course when a juror's views are known is to proceed cautiously.").

For all we know, Juror No. 13's view that Brown was "not guilty on all charges" was not even entrenched. The record does not support the district judge's prediction that Juror No. 13 necessarily "would have continued in the same

34

mindset." True, Juror No. 13 reportedly said that he "trusted the Holy Ghost" a few hours after he said that the Holy Spirit "told" him of Brown's across-the-board innocence. But Juror No. 8 reported that the other jurors asked Juror No. 13 to base his verdict on the evidence and the law. She never said that Juror No. 13 refused that request or was otherwise obstinate. *Cf. Augustin*, 661 F.3d at 1129 (other jurors reported that suspect juror had "made up her mind . . . well in advance of deliberations" as to a conclusion "based not upon the evidence and the law," and the other jurors had "spoken to her on numerous [occasions]" but it had "not helped" (internal quotation marks omitted)). To the contrary, Juror No. 8 told the judge that Juror No. 13 had not repeated any similar religious statements since he made them near the beginning of deliberations, including on the entire second day of deliberations.

The timing of Juror No. 13's statements does not support the reasons for his dismissal either. The district judge faulted Juror No. 13 for "express[ing] a conclusion from the beginning of the deliberations and without discussion with his fellow jurors." But jurors commonly share their initial views of a defendant's guilt or innocence at the beginning of deliberations. The evidence does not support a finding that Juror No. 13 would not reconsider his initial impression no matter what the other jurors said during the deliberations in which he was participating. The record suggests that Juror No. 13 did what many jurors often do: he entered

35

the jury room after having sat through a trial, "listen[ing] for the truth," and expressed to his fellow jurors that he did not think the defendant was guilty. Such an expression does not alone warrant dismissal.

The district judge's dismissal relied entirely on Juror No. 13's statements that he, as the court put it, "receiv[ed] information from a higher authority as part of his deliberative process" and was "told" by the Holy Spirit that Brown was "not guilty on all charges." He reasoned that a statement that "the Holy Spirit is directing or telling the person what disposition of the charges should be made" is— "by definition"—a "disqualifying statement." Juror No. 13 was "very earnest" and "very sincere" in his assurances that he was following the jury instructions, yet in the district judge's view, the juror's religious statements proved he was not basing his decision only on the law and the facts presented at trial. We acknowledge that the district judge did not, as he himself stressed, dismiss Juror No. 13 "cavalierly." He understood that the bar for the dismissal of a deliberating juror is high. But the judge failed to appreciate that Juror No. 13's statements were nothing like those made by jurors in other cases where religious beliefs have disqualified jurors.

Religious beliefs may provide the basis for removal when those beliefs do not permit them to complete their jury service. In *Geffrard*, for example, the dismissed juror sent the district judge a lengthy, combative letter explaining that, "[b]ecause of [her] religious beliefs . . . in Swedenborgianism," she "could not live

36

with a verdict of guilty for any of the accused on any of the charges." 87 F.3d at

451. "[She] believe[d] deep within [her] heart and soul and mind that they were

[entrapped]" even though the district judge had instructed the jury that entrapment

was not at issue. *Id.* She also made clear that her religious beliefs made it

impossible for her to deliberate; in her words, "to discuss the teachings of Emanuel

Swedenborg with the other jurors in relation to this case . . . would be like

discussing the theory of relativity with my cocker spaniel dog." *Id.* Courts may

exclude or remove jurors who make clear that they may not sit in judgment of

others based on their religious beliefs. *See, e.g.*, *United States v. Whitfield*, 590

F.3d 325, 360 (5th Cir. 2009); *United States v. Decoud*, 456 F.3d 996, 1003, 1005,

1016–17 (9th Cir. 2006); *United States v. Burrous*, 147 F.3d 111, 115, 117–18 (2d

Cir. 1998); *United States v. Pappas*, 639 F.2d 1, 3–4 (1st Cir. 1980). In capital

cases, jurors whose religious convictions prevent them from voting for the death

penalty or considering mitigating evidence against it, "regardless of [the jury]

instructions," are properly disqualified from jury service. *Morgan v. Illinois*, 504

U.S. 719, 728–29 (1992). And religious beliefs may provide grounds for

disqualification when the beliefs are in express disagreement with the substantive

law. *See Miles v. United States*, 103 U.S. 304, 310 (1880) (affirming exclusion of

jurors who "believed that polygamy was ordained of God" from bigamy trial).

37

In contrast to all those jurors, Juror No. 13 expressly disavowed that "any religious or moral beliefs [were] . . . interfering with [his] ability to decide the case on the facts presented and on the law as [instructed]." Even more importantly, Juror No. 13 drew *a direct and specific connection* between his self-understood religious duty and his—correctly described—legal duty as a juror to base his decision on the evidence. Juror No. 13 explained that not only had he "followed all the things that [the court] presented," but "[his] religious beliefs [we]re going by the testimonies of people given here, which [he] believe[d] [was] what [the jury was] supposed to do, and then render a decision on those testimonies, and the evidence presented in the room."

It is hard to imagine what kind of evidence could prove more convincingly that a religious juror should *not* be dismissed. After all, the original and traditional purpose of the juror's oath, like that of all official oaths, is "to superadd a religious sanction to what would otherwise be his official duty, and to bind his conscience" against misuse of his office. *Ex parte Milligan*, 71 U.S. (4 Wall.) 2, 31 (1866) (David Dudley Field on the side of the petitioner). Unlike those cases where unambiguous evidence made clear that the jurors' religious beliefs conflicted with proper jury service, Juror No. 13's statements were compatible with his sworn duty.

38

Jurors may pray for and believe they have received divine guidance as they determine another person's innocence or guilt, a profound civic duty but a daunting task to say the least. *See Robinson v. Polk*, 444 F.3d 225, 228 (4th Cir. 2006) (Wilkinson, J., concurring in the denial of rehearing en banc) ("The law need not deny the implements of faith to people when they need them the most."). Prayer is "a part of the personal decision-making process of many people, a process that is employed when serving on a jury." *State v. DeMille*, 756 P.2d 81, 84 (Utah 1988). "To ask that jurors become fundamentally different people when they enter the jury room is at odds with the idea that the jury be 'drawn from a fair cross section of the community[.]'" *Robinson*, 444 F.3d at 228–29 (Wilkinson, J., concurring in the denial of rehearing en banc) (quoting *Taylor v. Louisiana*, 419 U.S. 522, 527 (1975)). The district judge was wrong to conclude that Juror No. 13's statements that he received guidance in response to prayers were categorically "a bridge too far."

The district judge construed Juror No. 13's statements as not mere prayer for "enlighten[ment]" but a belief that "the Holy Spirit is directing or telling the person what disposition of the charges should be made." To the district judge, Juror No. 13 "admitted" that he was "following instructions from an outside source" as to "what his verdict should be." The judge thought that Juror No. 13 "failed to appreciate the conflict that presented with the Court's charge." We disagree.

39

Juror No. 13's vivid and direct religious language—read in the light of his other statements—suggests he was doing nothing more than praying for and receiving divine guidance as he evaluated the evidence or, in secular terms, provided an explanation of his internal mental processes—all consistent with proper jury service. Take Juror No. 13's statement that he had "received information" from "[his] Father in Heaven." A reference to his consideration of the evidence ("I have looked at the information") preceded those words. And he tied the words to the testimony he heard in the courtroom over the course of the trial ("in relation to what I heard here . . . [over] th[ese] past two weeks"). The words "received information" appear to have expressed his process of evaluating the testimony and evidence presented at trial. During the interview, the district judge himself understood that Juror No. 13 meant that he had "prayed" and "received guidance" as to how to render his verdict.

Juror No. 13's statements did not unambiguously refer to an "*outside* source t[elling] him" what to do or express that he was "using *external* forces to bring to bear on his decision-making." After all, Juror No. 13 "forthrightly admitted to" the supposedly disqualifying statements, even though he confirmed that he understood his duty to follow the jury instructions and base his decision on the evidence, a duty he swore an oath to God to discharge. And it is more than reasonable to doubt that a religious juror would have lightly violated his oath. *See* James Endell Tyler,

40

*Oaths; Their Origin, Nature, and History* 57 (London, John W. Parker 1834) (explaining that the phrase "[so] help me God" invokes "God's vengeance" when a juror does not "fulfil [his] engagement to speak the truth, or perform the specific duty"); *accord* Thomas Raeburn White, *Oaths in Judicial Proceedings and Their Effect Upon the Competency of Witnesses*, 51 Am. L. Reg. 373, 380 n.10 (1903) (stating that "So help me God" is shorthand for "So may God help me at the judgment day if I speak true, but if I speak false, then may He withdraw His help from me" (internal quotation marks omitted)); *Pierce v. Commonwealth*, 408 S.W.2d 187, 188 (Ky. 1966) (observing that "the use of the words 'So help me God' in the juror's oath" means that "the juror will, as God is his witness, decide the issues according to the evidence").

Undoubtedly, even many devout believers would stumble over the words "the Holy Spirit told me . . ." or "I received information from my Father in Heaven." Many people of faith are unused to hearing such expressions. But Juror No. 13's idiom was not in itself proof of misconduct.

People talk about religion in different ways. *See* Webb Keane, *Religious Language*, 26 Ann. Rev. Anthropology 47, 49, 64 (1997) ("[D]ifferent religious practices seem to select from among the entire spectrum of linguistic possibilities. . . . [L]inguistic form alone cannot tell us what people take their words to be doing[ or] where they believe those words originate."). And for many

41

contemporary Americans, to call prayer a conversation with God is more than a metaphor. A recent study by the Pew Research Center found that 74 percent of survey respondents said they try to talk to God or a higher power. Pew Rsch. Ctr., *When Americans Say They Believe in God, What Do They Mean?* 27 (2018). And about a third as many—28 percent of respondents—said that God or a higher power *talks directly to them*. *Id.*

Members of some religious groups are more likely than others to report two-way communication with God, underscoring that different people are used to thinking and talking about their prayer life in different ways—and that courts may not conclude that their vernacular alone disqualifies them from jury service. "Communicating with God is most common among evangelical Protestants and those in the historically black Protestant tradition, with nearly everyone in both groups saying they talk to God. Six-in-ten people in the historically black Protestant tradition say this communication is a two-way street," making them the only group with a majority saying so. *Id.* Among evangelicals, 45 percent of respondents said that God speaks to them directly. *Id.*

Juror No. 13's expression that God had communicated with him may be construed as his description of an internal mental event, not an impermissible external instruction. The anthropologist T.M. Luhrmann, who filed an *amicus* brief in support of Brown, recounts that certain American evangelicals "speak about

42

recognizing God's voice [and] talk about things God has said." T.M. Luhrmann, *When God Talks Back: Understanding the American Evangelical Relationship with God* 39 (2012) (internal quotation marks omitted). She explains that "[t]hey learn to identify some thoughts as God's voice, some images as God's suggestions, some sensations as God's touch or the response to his nearness." *Id.* at xxi. But, ordinarily, they "still experience those thoughts and images and sensations . . . as if they were [their] own, generated from within [their] own mind[s] and bod[ies]." *Id.* at 41. When believers converse with God in prayer, both their addresses to him and his replies—if any—are "inner mental phenomena." *Id.* at 47; *see also* Keane, *Religious Language*, at 61 ("Words that are framed as reported speech can thereby be portrayed as originating outside the present context . . . [such as] [w]hen Baptists hear the voice of the Spirit *in the inward self*" and talk about it publicly by "quoting divine speech." (emphasis added)).

Religious believers commonly describe God's guidance less as "an outward voice" than as "an inward whisper, a deep speaking into the heart, an interior knowing." Richard J. Foster, *Sanctuary of the Soul: Journey into Meditative Prayer* 11 (2011). Consider, for example, the Reverend Martin Luther King Jr.'s account of "hear[ing] the quiet assurance of an inner voice saying: 'Martin Luther, stand up for righteousness. Stand up for justice. Stand up for truth. And lo, I will be with you. Even until the end of the world.'" Martin Luther King, Jr., *The*

*Autobiography of Martin Luther King, Jr.* 77–78 (Clayborne Carson ed., 1998).

Similar understandings and expressions abound across a variety of religious

traditions. *See, e.g.*, Gershom Scholem, *On the Kabbalah and Its Symbolism* 94

(Ralph Manheim trans., Schocken Books 1996) (1960) (equating "the concept of

the one God" in Jewish mysticism with "what is revealed in the fulness of man's

inwardness"); M. K. Gandhi, *God is Truth* 36 (Anand T. Hingorani ed., 1957)

("For me the Voice of God, of Conscience, of Truth or the Inner Voice or the 'Still

Small Voice' means one and the same thing."); C. S. Lewis, *The Problem of Pain*

81 (1944) (stating that God "speaks in our conscience"); Marmaduke Pickthall,

*The Meaning of the Glorious Koran: An Explanatory Translation* 57:3, at 565

(1930) ("He is the First and the Last, and the Outward *and the Inward . . . .*"

(emphasis added)); Swami Vivekananda, *The Absolute and Manifestation* (1896),

*in* 2 *The Complete Works of Swami Vivekananda* 130, 141 (14th ed. 1958) ("He is

the nearest of the near."); Thomas à Kempis, *The Imitation of Christ* 77 (Richard

Challoner trans., TAN Books 2013) (c.1418–27) ("I WILL hear what the Lord God

will speak in me. . . . Blessed is that soul which heareth the Lord speaking within

her . . . . Blessed ears indeed, which hearken to truth itself teaching within . . . .").

And within the Christian tradition, the guidance of the Holy Spirit especially is

associated with divine indwelling. *See, e.g.*, *1 Corinthians* 3:16 (King James)

("Know ye not that ye are the temple of God, and that the Spirit of God dwelleth in

you?"); *Catechism of the Catholic Church* ¶¶ 2652, 2681 (describing the Holy Spirit as the "interior Teacher" and the "living water 'welling up to eternal life' in the heart that prays"); Martin Luther, *Exposition of the Fifty-First Psalm*, *in* 1 *Select Works of Martin Luther* 51, 153 (Henry Cole trans., London, W. Simpkin & R. Marshall 1826) ("The true Spirit, therefore, dwells in those who believe, not merely as to his gifts, but as to his substance.")

Juror No. 13's vernacular that the Holy Spirit "told" him Brown was "not guilty on all charges" was no more disqualifying by itself than a secular juror's statement that his conscience or gut "told" him the same. Of course, neither a religious nor secular juror may convict or acquit a defendant using his internal decision-making processes without regard to the evidence. But Juror No. 13 repeatedly explained that he was, in fact, reviewing and deliberating over the evidence. His statements are not proof that he "abandon[ed] his . . . judgment to what he . . . perceive[d] to be oracular signs." *DeMille*, 756 P.2d at 84. And just as a juror may say at the beginning of deliberations that he "thinks" a defendant is "not guilty on all charges," and perhaps later change his mind, Juror No. 13 could say that the Holy Spirit "told" him the same without violating his oath.

There is no evidence that Juror No. 13 believed himself unshakably bound to his initial understanding of the Holy Spirit's guidance, contrary to the district judge's assumption that Juror No. 13's "religious beliefs compelled him to

45

disregard" the jury instructions. *Cf. United States v. Salvador*, 740 F.2d 752, 754–55 (9th Cir. 1984) (affirming declaration of mistrial where juror stopped deliberating and refused to move from decision made through religious inspiration). Juror No. 13 may have, for instance, discerned upon further deliberation and review of the evidence, that his preliminary view was mistaken. *See* Luhrmann, *When God Talks Back*, at 41 ("These evangelical Christians . . . have to pick out the thoughts that count as God's and . . . do so in a way that does not violate the realistic demands of the everyday world.").

Let us not forget that "[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves." *Allen v. United States*, 164 U.S. 492, 501 (1896); *see also Peña-Rodriguez*, 137 S. Ct. at 861 ("[E]xperience shows that fair and impartial verdicts can be reached if the jury . . . undertakes deliberations that are honest, candid, robust, and based on common sense."). We must guard against the removal of a juror who, in vernacular commonly used by religious and racial minorities, expresses a view among jurors who "may well come to view the 'holdout' . . . not only as unreasonable, but as unwilling to follow the court's instructions on the law." *Thomas*, 116 F.3d at 622. And we must take care that judges, "who do not speak the language of ordinary people and may not understand or appreciate the way ordinary people live their lives," *Peña-Rodriguez*, 137 S. Ct. at 875 (Alito, J.,

46

dissenting), do not remove a juror solely because his vernacular led the judge to the same conclusion. *See Obergefell*, 135 S. Ct. at 2629 (Scalia, J., dissenting) (observing the absence of "a single evangelical Christian" on the "select, patrician, highly unrepresentative panel of nine" that is the Supreme Court).

Although the district judge proceeded cautiously, substantial and uncontradicted evidence that Juror No. 13 was in fact deliberating should have alerted the district judge that he "might [have been] excus[ing]" Juror No. 13 "under the mistaken view that the juror [was] engaging in impermissible nullification." *Abbell*, 271 F.3d at 1302. Juror No. 13 spoke "in terms of the evidence" in explaining his decision-making process, so "we cannot say that it is beyond doubt that [his] position during deliberations was the result of his defiant unwillingness to apply the law, as opposed to his reservations about the sufficiency of the Government's case." *Thomas*, 116 F.3d at 624. Because the record before us does not unambiguously show that Juror No. 13 was engaging in juror misconduct, the district judge's dismissal constituted an abuse of discretion and a violation of the Sixth Amendment. *Brown*, 823 F.2d at 597.

Our decision today follows directly from our and our sister circuits' precedents demanding satisfaction of the highest standard of proof to remove a juror from deliberations. We stress that we do not bless the use of metrics other than the evidence and the law to determine guilt. We do not contravene our

Constitution and "allow religious considerations to replace legal ones." *Robinson*,

444 F.3d at 227 (Wilkinson, J., concurring in the denial of rehearing en banc). But

we are not persuaded that Juror No. 13 came even close to doing such a thing.

This record establishes more than a substantial possibility that Juror No. 13

did not forsake his oath and instead was fulfilling his duty. Corrine Brown was

entitled to the unanimous verdict of a jury of ordinary citizens. The removal of

Juror No. 13—a juror who listened for God's guidance as he sat in judgment of

Brown and deliberated over the evidence against her—deprived her of one.

## IV. CONCLUSION

We **VACATE** Brown's convictions and sentence and **REMAND** for a new

trial.

NEWSOM, Circuit Judge, joined by GRANT, Circuit Judge, concurring:

I concur in the Court's judgment and join its opinion in full. I write separately only to make two important points.

First, notwithstanding how it will likely be reported, this is *not* a case about the single statement, "[T]he Holy Spirit told me . . . that Corrine Brown was not guilty on all charges"—it's a case about the context in which that statement was made and the entire record before us. And the entire record—which the Court meticulously traces over the course of 14 pages—establishes (at the very least) a "substantial possibility" that Juror No. 13 was rendering proper jury service, basing his decision on the evidence. *See* Maj. Op. at 5–18.

Second, and again notwithstanding how it will likely be reported, this is *not* a case about religious jurors—it's a case about all jurors. It would come out exactly the same way if Juror No. 13's comments had touched on some other topic. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 611, 623–24 (2d Cir. 1997) (Cabranes, J.) (reversing a district court's dismissal of a juror who reportedly had favored acquittal on the ground that "the defendants were his 'people'" but who was also said to be discussing and evaluating the evidence).

49

BRASHER, Circuit Judge, joined by BRANCH, Circuit Judge, concurring:

I agree with the way the Court applies our precedents to Juror 13's testimony about why he preliminarily voted to acquit the defendant. But I write separately to explain that, in my view, this record should not have been created. There was no cause for Juror 13 to testify at an evidentiary hearing about his religious convictions, his view of the evidence, or his understanding of a juror's role. The trial judge should not have inquired into Juror 13's thoughts in the first place.

A juror's initial view of the case is not what matters. Because a verdict must be unanimous, our pattern jury instructions tell jurors that they "must discuss the case with one another and try to reach an agreement." 11th Cir. Pattern Jury Instr. B11. To deliberate, jurors must "reexamine [their] own opinion and change [their] mind if [they] become convinced" that their initial view was wrong. 11th Cir. Pattern Jury Instr. B11.

This is a difficult and, sometimes, emotional process that requires candor and good faith. Jurors must express themselves, challenge each other, and work toward common ground. For that reason, our law has long recognized the importance of confidentiality and secrecy: "[f]reedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world." *Clark v. United States*, 289 U.S. 1, 13 (1933). After every trial, the district courts in this circuit assure jurors that "[y]our

50

deliberations are secret, and you'll never have to explain your verdict to anyone." 11th Cir. Pattern Jury Instr. B11. *See also* Local Rules, M.D. Fla. 5.02(d)(1) ("No party may communicate with a juror or respond to a juror's unsolicited communication during or after trial.").

When disputes arise between jurors, the default response should be deliberation, not investigation. After the case goes to the jury, the judge's task is simple: he should ensure that the jurors understand the law, appreciate their responsibility, do not commit misconduct, and deliberate in good faith. Absent truly extraordinary circumstances, such as jury tampering, a judge should not question a juror about why he wants to acquit or convict. And, while the jury is actively deliberating, it is never appropriate for a judge to "inquir[e] into [a] juror's thoughts." *United States v. Thomas*, 116 F.3d 606, 620 (2d Cir. 1997). Let the deliberations play out, let one juror convince another that he is wrong, and let the jury return a verdict.

The trial judge here short-circuited this process. A juror complained about something that another juror said. But the jury was still deliberating. The jury had not reached a stalemate; there was no holdout juror; there was no impasse; no misconduct required the judge's attention. The district judge could have reasonably and lawfully responded to this complaint in any number of ways. He could have reinstructed all the jurors about the need to weigh the evidence and deliberate with

51

one another. He could have talked to the complaining juror to make sure deliberations were continuing. He could have talked to the complained-about juror to make sure that he was deliberating in good faith. But a district judge should not—when faced with a complaint of this nature—hold an evidentiary hearing on what, exactly, a juror meant by something that he said at the beginning of deliberations.

My dissenting colleague suggests that the line is not entirely clear between an allegation of misconduct and the allegations about Juror 13 in this case. But I respectfully disagree. Misconduct is something a juror does; it is an "action by jurors that is contrary to their responsibilities." Dissenting Op. 81 n.7 (quoting *United States v. McGill*, 815 F.3d 846, 866 (D.C. Cir. 2016)). When the jury is deliberating, an investigation into a juror's *actions* may be appropriate. *See, e.g., United States v. Augustin*, 661 F.3d 1105, 1131 (11th Cir. 2011) (inquiry into whether juror was refusing to deliberate and lied about being sick); *United States v. Ronda,* 455 F.3d 1273, 1297 (11th Cir. 2006) (inquiry into whether juror was watching news about the trial). But an investigation into a juror's *thoughts* is not. And that is what happened in this case. There was never any allegation that Juror 13 refused to deliberate or that he had committed any other form of misconduct. Instead, the allegation was, and continues to be, that he was not thinking correctly.

52

Juror 13 did an admirable job of explaining his thought process to the district judge. But this kind of examination—without any allegation that the juror was not deliberating—was an abuse of discretion.

WILSON, Circuit Judge, joined by MARTIN, JORDAN, and ROSENBAUM, Circuit Judges, dissenting:

On the majority's reading of a cold transcript, there was a substantial possibility that Juror No. 13 was basing his decision solely on the evidence and the law. The district court—able to hear live testimony and observe the juror's tone, inflection, and demeanor—came to the contrary conclusion. Because the district court was "uniquely situated" to make this determination, I would not supplant its judgment with my own. *See United States v. Abbell*, 271 F.3d 1286, 1303 (11th Cir. 2001) (per curiam); *United States v. Godwin*, 765 F.3d 1306, 1316 (11th Cir. 2014).

District judges walk a tightrope when deciding whether to remove a juror mid-deliberations. A misstep in one direction—improperly removing a holdout juror—imperils the defendant's Sixth Amendment right to a unanimous jury verdict. A misstep in the opposite direction—allowing a juror to vote without regard to the merits of the case—undermines each party's right to a verdict based on the evidence and threatens the rule of law. *See Robinson v. Polk*, 444 F.3d 225, 227 (4th Cir. 2006) (mem.) (Wilkinson, J., concurring in the denial of rehearing en banc) ("Juries have legitimacy in a democracy because, despite the variety of jurors' beliefs, they are united in the common endeavor of legal judgment. Any contrary perception threatens the most basic premise of the rule of law.").

54

For this reason, juror removal decisions are particularly challenging. Yet the law of our circuit is calibrated to this challenge (or at least, it *was*). The "tough" standard of proof applied by district courts—the "substantial possibility" test—safeguards the defendant's right to a unanimous verdict.[1] *Abbell*, 271 F.3d at 1302. Equally important is our deferential appellate standard of review. *Id.* at 1302–03. Because district courts are best positioned to assess a juror's capability and willingness to properly deliberate, we review for clear error a district court's factual determination that a juror was not following the court's instructions, and we review for abuse of discretion the ultimate determination to excuse a juror. *Id.* By deferring to district courts, we increase the likelihood of getting this difficult decision right.

The district court in this case made a factual finding that there was no substantial possibility that a juror who said the Holy Spirit told him to acquit on all charges was basing his decision on the merits of the case. There is a reasonable reading of the record that supports that finding. And while the majority says we must reverse if the record allows for any contrary interpretation, clear error review calls for us to affirm. *See Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017).

---

[1] Under the "substantial possibility" test, "a juror should be excused only when no 'substantial possibility' exists that she is basing her decision on the sufficiency of the evidence." *Abbell*, 271 F.3d at 1302. This standard is basically equivalent to the beyond-a-reasonable-doubt standard. *Id.*

The majority casts the district court's decision as misconstruing religious expression while failing to safeguard the right to a unanimous jury verdict. On this record, I cannot agree. The decision to remove Juror No. 13 was a tough call, and one the district court did not take lightly. But from the district court's superior vantage point, it was necessary to ensure that a verdict was rendered based on the law and evidence—a principle that is foundational to our system of justice. *See Turner v. Louisiana*, 379 U.S. 466, 472 (1965). For these reasons, I respectfully dissent.

*     *     *

I divide my dissent into three parts. In Part I, I will show that a district court's determination that a juror is not deliberating as instructed is a factual finding to which we owe deference. In Part II, I will explain why the district court in this case did not abuse its discretion. Finally, in Part III, I will explain that the district court's decision was not an affront to people of faith, and that by affirming the district court, we would bolster—rather than undermine—Sixth Amendment rights.

## I.    The Substantial Possibility Finding Is a Factual Determination Reviewed for Clear Error

I begin with the crux of this appeal—the standard of review. The leading juror removal case in our circuit, *Abbell*, sets forth the applicable standard clearly

56

and precisely, and it explains the interplay between the underlying standard of

proof and the appellate standard of review:

> We review a district court's ultimate decision to excuse a juror after the start of deliberations for abuse of discretion. . . .
> . . . .
>
> We also conclude that, for example, whether a juror is purposely not following the law is a finding of fact that we will review for clear error. . . . [A] district judge is required to apply the "substantial possibility" standard to his own investigation and in coming to his determination that the juror is or is not basing her decision on the sufficiency of the evidence. But, if the trial court applies this standard and determines *as a matter of fact* that no substantial possibility exists that the pertinent juror is basing her decision on the sufficiency of the evidence, we will review that finding only for *clear error*.

*Abbell*, 271 F.3d at 1302–03 (emphases added). *Abbell* thus explains that despite

the "tough legal standard" applied by the district court, our review is deferential.

*Id.* at 1302. Our circuit precedent has since adhered to this standard. *See Godwin*,

765 F.3d at 1316, *United States v. Oscar*, 877 F.3d 1270, 1287 n.14 (11th Cir.

2017); *United States v. Augustin*, 661 F.3d 1105, 1129 (11th Cir. 2011) (per

curiam).

Although the majority has the prerogative to overrule *Abbell* and its progeny

given that we are sitting en banc, it does not purport to do so. That is effectively

what it does though, shelving *Abbell*'s deferential appellate review and replacing it

with something more closely resembling de novo review. I will explain first why

the majority's holding is misaligned with *Abbell*.  Next, I will explain why

departing from *Abbell* is a mistake.

### A.    The Majority Abandons Circuit Precedent

The majority's formulation tracks two out-of-circuit cases.  *See United States v. Brown*, 823 F.2d 591 (D.C. Cir. 1987); *United States v. Thomas*, 116 F.3d 606 (2d Cir. 1997).  Rather than treating the "substantial possibility" finding as a factual determination to be reviewed for clear error, the court in each of these cases reviewed the record itself to determine whether there was a substantial possibility that the juror was basing his decision on the sufficiency of the evidence.  *Brown*, 823 F.2d at 596 (reversing removal of a juror because the record "indicate[d] a substantial possibility that [the] juror . . . believed that the evidence offered at trial was inadequate to support a conviction"); *Thomas*, 116 F.3d at 624 (reversing removal of a juror when "the record evidence raise[d] a possibility that the juror was simply unpersuaded by the Government's case against the defendants").  In other words, the circuit court reviewed the record anew and reversed if it came to a different conclusion than the district court.

These opinions "help guide us," the majority says, "[b]ecause we expressly adopted the D.C. and Second Circuits' standard" in *Abbell*.  Maj. Op. at 26.  Not so.  While *Abbell* adopted the "substantial possibility" standard of proof from *Brown* and *Thomas* to be applied by district courts, we established a more

58

deferential appellate standard of review. *Abbell*, 271 F.3d at 1302–03. The majority opinion does not grapple with this variance. It gives lip service to *Abbell*'s appellate standard of review, Maj. Op. at 30, but effectively discards *Abbell* in favor of *Brown* and *Thomas*. *See id.* at 25 (citing *Abbell* but asserting that "we"—just like the district court—"examine the record to ensure that '*no substantial possibility*' existed that the dismissed juror was rendering proper jury service"); *id.* at 29 (questioning whether the determination that Juror No. 13 was not deliberating according to the court's instructions "can be called [a finding] at all," despite *Abbell*'s clear teaching that this is a factual finding). Under the *Brown* and *Thomas* standard—adopted by the majority today—we can affirm a district court's removal of a juror only if the record on appeal unambiguously shows juror misconduct. *See id.* at 47.

This framework is incompatible with *Abbell*'s clear error review. The Supreme Court has been unequivocal in holding that "the very premise of clear error review is that there are often 'two permissible'—because two 'plausible'—'views of the evidence.'" *Cooper*, 137 S. Ct. at 1468 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)); *see also United States v. Rodriguez De Varon*, 175 F.3d 930, 945 (11th Cir. 1999) (en banc) ("As the Supreme Court has recognized, a trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review."). Accordingly, we

59

cannot "overturn a finding simply because we are convinced that we would have decided the case differently." *Glossip v. Gross*, 576 U.S. 863, 881 (2015) (alterations adopted and internal quotation marks omitted).

Of course, the underlying standard of proof—no substantial possibility—still has a role to play on appeal. Without it, we would be reviewing whether the record reasonably supports a finding that the juror was not basing his decision on the facts and the law. Because of the heightened standard of proof, we are instead reviewing whether the record reasonably supports a finding that there was *no substantial possibility* that the juror was basing his decision on the facts and the law. *Abbell*, 271 F.3d at 1302. Therefore, the underlying standard of proof informs the application of the appellate standard of review. But relying on the standard of proof to reverse the district court where a reasonable construction of the evidence supported its conclusion goes much too far—it obliterates the factfinder's role and distorts the clear error standard of review.

In reality, by holding that reversal is appropriate on anything less than an unambiguous record, the majority is not reviewing for clear error. It is doing exactly what clear error review forbids: reversing the district court because it is "convinced" that, on its own reading of the record, it "would have decided the case differently." *See Glossip*, 576 U.S. at 881. As a result, I can only conclude that

60

rather than "help[ing] guide us," *Brown* and *Thomas* have replaced *Abbell* and its progeny as the law of our circuit. That is a mistake, as I will explain next.

### B.    Abandoning Circuit Precedent is a Mistake

As an appellate court, we are tasked not just with deciding the case before us, but with considering the broader application of the rules we pronounce. *See Shahar v. Bowers*, 120 F.3d 211, 213 n.4 (11th Cir. 1997) (per curiam) (en banc). So before turning to the facts of this case, I will explain why, as a general matter, decisions about whether a juror is deliberating as instructed are best left to district courts and best reviewed for clear error, as our circuit precedent has recognized.

The primary rationale for clear error review is that the trial judge is in a superior position to make factual determinations—especially those involving credibility, where our deference to a district court's factual findings is at its zenith. *See Anderson*, 470 U.S. at 575. This rationale is squarely implicated in juror removal decisions. "[B]ecause the demeanor of the pertinent juror is important to juror misconduct determinations, the district court is uniquely situated to make the credibility determinations that must be made in cases like this one: where a juror's motivations and intentions are at issue." *Abbell*, 271 F.3d at 1303; *see also Owens v. Wainwright,* 698 F.2d 1111, 1113 (11th Cir. 1983) (per curiam) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony.").

61

The Supreme Court has made the same point when describing the role of district courts in the analogous voir dire context. There, district courts make ex ante determinations about jurors' willingness and capacity to render decisions based on the evidence and the law. In doing so, they assess "the venireman's state of mind . . . based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Wainwright v. Witt*, 469 U.S. 412, 428 (1985); *see also Skilling v. United States*, 561 U.S. 358, 386 (2010) ("Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record . . . ."). If credibility and demeanor are important in forecasting whether a juror *will* base a decision on the merits of the case, they are at least equally important in assessing whether a juror actually *is* doing so.

It is important to note that the district court's ability to personally observe the juror is vital not only to making credibility determinations but also to accurately comprehending what a juror is saying. *See Anderson*, 470 U.S. at 575 ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."); *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1357 (11th Cir. 2020) (opinion of Brasher, J.) ("Demeanor plays a fundamental role not only in

determining juror credibility, but also in simply understanding what a potential juror is saying.") (citing *Patton v. Yount*, 467 U.S. 1025, 1038 n.14 (1984)). Indeed, "the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words." *Id.* at 1351 (alteration adopted) (quoting *Reynolds v. United States*, 98 U.S. 145, 156–57 (1878)). District courts hold a pronounced advantage over appellate courts in this regard.

The majority contends, nevertheless, that affording too much deference to district courts would undercut defendants' Sixth Amendment right to a unanimous verdict and turn the underlying standard of proof on its head. Maj. Op. at 25. This contention is ill-supported. "Many [decisions committed to the trial court's discretion] implicate important substantive rights." *See* Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review* 83 (3d ed. 2018). Only a few years ago in *Peña-Rodriguez v. Colorado*, for example, the Supreme Court reviewed for abuse of discretion a district court's determination of whether the Sixth Amendment requires post-verdict judicial inquiry into a juror's statement in deliberations indicating racial bias. 137 S. Ct. 855, 869 (2017). Despite the constitutional right at issue, the Court explained that the determination was one "committed to the substantial discretion of the trial court in light of all the circumstances." *Id.* As this example illustrates, there is nothing unusual about district courts exercising discretion over decisions that involve important constitutional rights.

63

Neither does affording deference to district courts dilute the standard of proof. Standards of proof and appellate standards of review serve different functions. The underlying standard of proof asks: How confident must the factfinder be in the correctness of his conclusion? *See California ex rel. Cooper v. Mitchell Bros.' Santa Ana Theater*, 454 U.S. 90, 92–93 (1981) (per curiam). The standard of review asks a different question: Who is best equipped to make this decision? *See Anderson*, 470 U.S. at 574. Given this distinction, a deferential standard of review in this instance does nothing to lower the heightened standard of proof required for juror removal—it simply recognizes that a district court is better positioned to determine whether that heightened standard is met.

An analogy to sufficiency of the evidence review—which, despite a heightened standard of proof, preserves the factfinder's role as weigher of the evidence—helps illustrate this point. *Cf. United States v. Kemp*, 500 F.3d 257, 305 (3d Cir. 2007) (explaining that because the substantial possibility standard "is similar to the beyond-a-reasonable-doubt standard, analogizing this situation to a criminal proceeding is useful"). The underlying standard of proof in a criminal trial—beyond a reasonable doubt—is demanding, and a criminal conviction violates due process if that standard is not met. *See Jackson v. Virginia*, 443 U.S. 307, 316, 319 (1979). Nevertheless, a guilty verdict is difficult to overturn on appeal. *See United States v. Capers*, 708 F.3d 1286, 1297 (11th Cir. 2013). If any

64

reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt, we will not overturn the jury's verdict. *Id.* Similarly, we are dealing with an alleged constitutional error in this circumstance, and the underlying standard of proof is stringent. *Abbell*, 271 F.3d at 1302–03. But rather than duplicate the district court's analysis on appeal, we apply a deferential standard of review. *Id.*

Obviously, our review here is not identical to sufficiency of the evidence review. We do not view the evidence in the light most favorable to the government, nor do we consider the legal question of whether any rational trier of fact could have reached the factfinder's conclusion. *See Jackson*, 443 U.S. at 319. But the analogy illuminates that deferential appellate review does not "turn our 'tough' standard [of proof] on its head" or allow constitutional errors to "evade detection." Maj. Op. at 25. As *Abbell* recognized, a heightened standard of proof can coexist with a less-exacting appellate standard of review without compromising constitutional rights. Abandoning that precedent now is a mistake.

## II.    The District Court Did Not Abuse Its Discretion

Mindful of the deference owed to the factfinder in juror removal decisions, I cannot conclude on this record that the district court abused its discretion. When a complaint of juror misconduct arises during deliberations, a district court has two roles to perform: that of an investigator to uncover the truth of what is going on,

65

and that of an arbiter to determine what remedy, if any, is appropriate. *See Abbell*, 271 F.3d at 1303 (noting that a district court "appl[ies] the 'substantial possibility' standard to [its] own investigation"). If the district court, acting as arbiter, decides that removal is appropriate, we will reverse that decision only if it was "without factual support, or for a legally irrelevant reason." *Id.* at 1302.

Once we apply the correct standard of review, it is clear that the district court did not abuse its discretion in its role as arbiter by dismissing Juror No. 13. First, I will explain that the district court understood the governing legal standard and removed Juror No. 13 for a legally relevant reason. Second, I will show that there was factual support for the district court's conclusion that Juror No. 13 was not following the court's jury instructions. Finally, in response to Judge Brasher's concurrence asserting that the district court should not have inquired into Juror No. 13's thought process, I will explain why a limited inquiry was a proper exercise of the court's discretion in its role as investigator.

## A.    The District Court Excused Juror No. 13 for a Legally Relevant Reason

The record makes clear that the district court recognized the core question it had to answer: whether Juror No. 13 was simply doubtful of the sufficiency of the government's evidence, or whether he felt compelled to follow what he perceived as a divine directive. *Cf. id.* at 1302–03. The district court explicitly rejected the notion that Juror No. 13 might simply be evaluating the sufficiency of the

66

evidence, calling that "a mischaracterization of the situation." The court then explained that it found "beyond a reasonable doubt that there was no substantial possibility [that Juror No. 13] could base his decision on the Court's instructions and the evidence adduced at trial." As a result, the court dismissed the juror. This determination tracked the correct legal standard and was certainly legally relevant. *Abbell*, 271 F.3d at 1302–03.

The majority faults the district court for viewing Juror No. 13's statement about the Holy Spirit as "categorically disqualifying." Maj. Op. at 2. Read in context, however, the district court did not find the statement disqualifying until *after* interviewing Juror No. 13 to learn what he meant by that statement and whether it continued to reflect his decision-making process. The district court explained the decision to excuse Juror No. 13 by noting that "not only did Juror No. 13 make this statement, but it appears that he continues to believe that he is being told by a higher power how he ought to proceed in these deliberations."

If the district court thought the statement was disqualifying as a matter of law—regardless of what was meant by it and the degree to which it continued to color the juror's deliberation—the court could simply have confirmed the statement with the other jurors and dismissed Juror No. 13 on that basis. In other words, to believe the court established a per se legal rule, we would have to believe that it was going to find Juror No. 13's statement disqualifying no matter what, and

67

that the investigation was a charade. I see no evidence of that in the record. To the contrary, the district court determined what to make of Juror No. 13's statement only after carefully investigating to establish legally relevant facts.

**B.    There Was Factual Support for the District Court's Finding**

In questioning the factual basis for the district court's decision, the majority says that none of Juror No. 13's statements indicate that he could not apply the law. Maj. Op. at 31. This characterization of the record ignores the district court's demeanor and credibility findings and overrides its interpretation of the testimony.

A review of some key facts is useful here. On the evening of the second day of deliberations, Juror No. 8 called the courtroom deputy and expressed that she and other jurors were concerned that Juror No. 13 had been talking about higher beings since the beginning of deliberations. The district court conferred with the parties the next morning and explained its initial reaction that it was "difficult to tell how serious" the issue was. The court thought that any issues might be the product of "the natural frustration or dialogue or tensions that go on in any jury deliberations." And if there were a deeper issue, the court thought it equally likely that the root of the issue was with Juror No. 8 as with Juror No. 13. The court was not rushing to any conclusions. Both parties, however, believed that some inquiry was necessary to determine whether there was a mere disagreement among jurors, or whether one or more jurors were not following the court's instructions.

68

The court reluctantly agreed.  It began by conversing with Juror No. 8 and reading a letter she had prepared.  Juror No. 8's testimony, along with her letter, established that she and other jurors were concerned about two comments made by Juror No. 13.  First, at the very beginning of deliberations, Juror No. 13 said that a higher being told him Corrine Brown was not guilty on all charges.  Second, Juror No. 13 said a few hours later that he "trusted the Holy Ghost."  Juror No. 8 reported that while these comments were not an obstacle to her own deliberation, she and other jurors were concerned about Juror No. 13's ability to deliberate.

Based on its colloquy with Juror No. 8, the district court considered it possible that Juror No. 13 was simply praying for guidance.  That, of course, would present no issue.  The court also considered it possible that Juror No. 13 was "raising some religious view that would prevent him from ever determining that . . . Ms. Brown was guilty."  If that were the case, the court reasoned, that would be "problematic."  Still, the court reserved judgment as to which of these scenarios was playing out in deliberations.

The next step, the court determined, was to interview Juror No. 13 and to inquire whether he was basing his decision on the merits of the case or, instead, on divine revelation in a way that was detached from the merits.  At this point, the court was not convinced that Juror No. 13's initial statement, even if confirmed, would be disqualifying.  The court was "certainly open to th[e] possibility" that a

69

conversation with Juror No. 13 would quell any concern as to whether he was following the court's instructions.

The court then engaged in two colloquies with Juror No. 13, which the majority sets out in detail. Maj. Op. at 10–15. In the first colloquy, the court asked Juror No. 13 questions including whether he had any beliefs preventing him from being fair and impartial, whether he was deliberating, whether he was following the court's instruction, and whether he had invoked a higher power. When Juror No. 13 confirmed that he had invoked a higher power, the court inquired about the extent to which that higher power was guiding his deliberation, and whether there was any inconsistency between his religious beliefs and his ability to serve as a juror. In the second colloquy, the court confirmed with Juror No. 13 that he had made the statement reported by Juror No. 8 at the beginning of deliberations when the jurors were discussing the first charge.

I agree that on a cold transcript some of Juror No. 13's responses to these questions could support the majority's conclusion that he was deliberating according to the court's instructions. For example, Juror No. 13 said: "I followed all the things that you presented. My religious beliefs are going by the testimonies of people given here, which I believe that's what we're supposed to do, and then render a decision on those testimonies, and the evidence presented in the room." Yet other responses were consistent with the conclusion that Juror No. 13 believed

70

he was compelled to render a particular verdict based on a divine directive: "I received information [from my Father in Heaven] as to what I was told to do in relation to what I heard here today—or this past two weeks."

The majority's view is that without the facts pointing unambiguously toward the latter conclusion, we must reverse the decision to remove Juror No. 13. But, as our case law shows, what appears ambiguous to us on a cold record may have been clear to the district court. In *Abbell*, for example, the transcript of the excused juror's testimony left ambiguous whether her objection was to the sufficiency of the government's case. 271 F.3d at 1304 (noting that the excused juror's "own testimony on her commitment to following the law was not certain"). Similarly to Juror No. 13, the juror in *Abbell* stated several times that she was deliberating and considering the evidence. *See* Brief of the Appellant at 16, *Abbell*, 271 F.3d 1286 ("I [have] been reading like everybody else through the evidence. I've been giving my point of views [sic]."). She was adamant that she was deciding the case as instructed. She said that she had "been following the law" but did not have to "change [her] vote to please the others." *Id.* at 15. And she said that she had "reasonable doubt" about the government's case. *Id.* at 16. The source of her disagreement with the other jurors, she said, was the way in which she was applying her "common sense" to the testimony. *Id.* Nevertheless, we affirmed the decision to remove the juror because, despite her seemingly ambiguous testimony,

71

the record as a whole supported the conclusion that there was no substantial possibility she was basing her decision on the sufficiency of the evidence. *Abbell*, 271 F.3d at 1304; *see also Godwin*, 765 F.3d at 1315 (affirming a juror's dismissal even though the juror "not surprisingly, denied that he was refusing to follow the court's legal instructions"); *cf. Uttecht v. Brown*, 551 U.S. 1, 18 (2007) (alternatively upholding, on independent review of the record, the trial court's decision to excuse a prospective juror in a capital case: "Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case because there was no possibility of release. His assurances did not require the trial court to deny the State's motion to excuse Juror Z.").

Here, the majority fails to credit at least three important ways in which the district court was able to resolve any apparent ambiguities and determine that the "no substantial possibility" standard was met. First, the district court was able to make credibility determinations. Second, it could use its personal observation to draw an accurate understanding of live testimony. Third, it could exercise discretion in determining how heavily to weigh each piece of evidence.

To the first point, the court explicitly stated that it "judg[ed] Juror No. 13's credibility." Specifically, Juror No. 13's "statement that he was following [the

72

court's] instructions did not convince [the court] that he was able to do so." Yet the majority insists that the district court made no credibility determination, other than that Juror No. 13 made the statement Juror No. 8 had reported. The majority stresses that the district court characterized Juror No. 13 as "very earnest," "very sincere," and as someone who "believes that he is rendering proper jury service" rather than someone who was being "deceptive about following the jury instructions." Maj. Op. at 29. If the court found Juror No. 13 to be "sincere" and not "deceptive," the majority reasons, this appeal cannot be "one that turns on demeanor or credibility determinations." *Id.*

That reasoning misses the mark. A factfinder can determine that testimony is not credible (unworthy of belief[2]) without necessarily determining that the testimony is "deceptive" or "[in]sincere." By analogy to voir dire, a prospective juror's own "assurances that he is equal to th[e] task cannot be dispositive," *Murphy v. Florida*, 421 U.S. 794, 800 (1975), not only because the juror might intentionally conceal bias, but also because he might be unaware of the bias. *Smith v. Phillips*, 455 U.S. 209, 221–22 (1982) (O'Connor, J., concurring). That is, a juror's claim that he can properly deliberate might be sincere but not credible.

That is the distinction the district court made. The court observed that Juror No. 13 was "sincere" in his beliefs, but also that he was hesitant and evasive in

---

[2] *Credibility*, Black's Law Dictionary (11th ed. 2019).

answering the court's questions.  Despite the sincerity of Juror No. 13's beliefs, the district court did not credit his assertion that he was deliberating as instructed.  The district court, as factfinder, was entitled to make that determination.  *See United States v. Brown*, 947 F.3d 655, 676 (11th Cir. 2020).

And to the extent the majority faults the district court for not making a more explicit credibility finding, it fails to recognize the deference we owe even to implicit findings.  Sitting en banc*,* we have held that where—as here—the district court is acting as the factfinder, "we . . . infer[ ] from a district court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated."  *United States v. $242,484.00*, 389 F.3d 1149, 1154 (11th Cir. 2004) (en banc).  The district court's ultimate finding that Juror No. 13 could not or would not follow the law depends on the court's implicit finding that it did not believe Juror No. 13's assurances.  Indeed, on the very point at issue here, we have explained that "[w]e afford substantial deference to the factfinder's credibility determinations, both explicit *and implicit*."  *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (emphasis added).

To the second point, the district court was also better positioned to understand Juror No. 13's testimony.  *Anderson*, 470 U.S. at 575; *cf. Teasley*, 978 F.3d at 1351.  As we recently noted, "there is more to human communication than the words we use," and, as a result, "it can be hard for judges to glean meaning

from a cold trial transcript." *Teasley*, 978 F.3d at 1351. For that reason, I find the majority's interpretation of Juror No. 13's testimony unconvincing. The majority makes the case, for example, that when Juror No. 13 said that he had been "receiv[ing] information" about what to do "in relation to what [he] heard" in court, he was "express[ing] his process of evaluating the testimony and evidence presented at trial." Maj. Op at 40–41. The district court, based on its personal observation, understood the testimony to mean something different—that Juror No. 13 was expressing a belief "that a higher power was telling him how he ought to proceed in the deliberations." Whatever alternative explanations can be offered on appellate review, I would defer to the district court's understanding of Juror No. 13's testimony, which was based on firsthand, personal observation. *See Teasley*, 978 F.3d at 1351.

And to the third point, after making a credibility determination and drawing its best understanding of the testimony, the district court could assess how heavily to weigh each piece of evidence in determining whether the demanding standard of proof was met. *Exempt Carriers, Inc. v. United States*, 644 F.2d 1027, 1029 (5th Cir. 1981) ("Determinations regarding . . . the weight to be given conflicting evidence are the exclusive province of the factfinder.").[3] The district court was not

---

[3] We are bound by decisions of the Fifth Circuit handed down by the close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

required to simply tally which of Juror No. 13's statements weighed for and against removal, and then compare each side of the ledger. Rather, the court could use its discretion to determine which pieces of evidence it should weigh most heavily. The juror's statement that the Holy Spirit told him Brown was not guilty on all charges was not the only piece of evidence. But the district court had discretion to weigh that statement heavily in assessing whether the "no substantial possibility" standard was satisfied. *See id.*

Having made a credibility determination, formed its best understanding of the testimony, and weighed the evidence, the district court concluded that "in [its] view, the record [wa]s clear" that removal was appropriate.[4] Based on this record, I certainly do not have a "definite and firm conviction" that the district court's determination was wrong. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

### C.    The District Court's Limited Inquiry Was Not an Abuse of Discretion

Judge Brasher's concurrence, citing *Thomas*, suggests an additional ground for reversal—that the district court abused its discretion in its role as investigator

---

[4] Keeping in mind that the "no substantial possibility" standard means, basically, "beyond a reasonable doubt," *Abbell*, 271 F.3d at 1302, it is important to remember that this standard did not require the district court to rule out every possible alternative hypothesis. *See United States v. Iriele*, 977 F.3d 1155, 1168 (11th Cir. 2020). Even if one construction of the evidence supported a hypothesis that Juror No. 13 was basing his verdict on the merits, the district court could have rejected that construction and reasonably construed the evidence in a way that established beyond a reasonable doubt that he was not following the court's instructions. *See id.*

by inquiring into Juror No. 13's thought process.  Brasher Conc. Op. at 50.

Though the majority does not decide the case on this ground, it similarly endorses

*Thomas*'s hands-off approach to investigating complaints of juror misconduct.

Maj. Op. at 28.  I disagree that a hands-off approach is the right model for cases

like this going forward.  Although well-intentioned, this model encourages district

courts to abdicate their role in ensuring that verdicts are anchored in the law and

the evidence.

As I see it, when a district court receives a report that a juror is not basing

his decision on the merits, the court has roughly four options: (1) conduct a

rigorous investigation before taking action, (2) take action (declare a mistrial or

remove the juror) without inquiring into the basis for the juror's decision, (3) leave

the juror in place without inquiring into the basis for the juror's decision,[5] or (4)

conduct a limited investigation into the basis for the juror's decision before taking

action, as the district court did here.  While the proper course of action will depend

on the facts of each case, I think the district court's limited inquiry is an

appropriate choice on facts like these.  I will briefly outline each of the four

possible courses of action and explain why I reach that conclusion.

---

[5] If the court chooses this option, it might speak with the complaining juror and perhaps reinstruct the jury, but would not inquire into the complained-of juror's decision-making.

To start with, the rigorous investigation model would seem the natural choice for the majority. The majority tells us that a district court, as arbiter, can make a decision to remove a juror based only on a record that will unambiguously support that decision on appeal. To develop such a record, the investigation would likely have to be robust. And, in fact, the main difference between this appeal and leading cases like *Abbell* and *Godwin*—where we affirmed the dismissal of jurors who insisted they were following the court's instructions—is that the investigations were more exhaustive in those cases. *Abbell*, 271 F.3d at 1303–04; *Godwin*, 765 F.3d at 1315. Recognizing this, Brown stressed at oral argument that, before deciding to remove a juror in a case like this, it is important for the judge to talk to every other juror. Oral Argument Recording at 18:31–19:07 (February 23, 2021).

But the majority rejects this model (with good reason). A rigorous investigation has serious drawbacks in a case like this one—first and foremost that it compromises juror secrecy. As a representative example, the First Circuit pointed to its decision in *United States v. Bradshaw* as a model for district courts investigating complaints of misconduct:

> When informed of the incident, the [district] court first conducted an individual voir dire of each juror to determine precisely what had occurred and assess the magnitude of its impact on the jury's deliberations. . . . Then, the court gave a strongly-worded curative instruction. . . . Finally, the court undertook a second

78

> round of individual voir dire examinations, inquiring into each juror's ability to put out of his or her mind entirely the facts and circumstances of the extraneous document so he or she might decide the case solely on the evidence introduced at trial. . . . During its questioning, the court probed the extent of the jurors' exposure to the extraneous information and its potential impact on their ability to render an impartial verdict.

*United States v. Lara-Ramirez*, 519 F.3d 76, 87 (1st Cir. 2008) (alterations adopted and internal citations omitted) (citing *United States v. Bradshaw*, 281 F.3d 278, 290–92 (1st Cir. 2002)).

While this approach may have the benefit of producing a robust record on which to determine whether the jury can render a verdict in accordance with the court's instructions, the drawbacks are too severe. If the door to the jury room is to be opened, it should be opened narrowly. Overly intrusive investigations are likely to unnerve jurors and cause them to be less open in their discussions. *See Thomas*, 116 F.3d at 623; *Rakes v. United States*, 169 F.2d 739, 745 (4th Cir. 1948) ("If jurors are conscious that they will be subjected to interrogation or searching hostile inquiry as to what occurred in the jury room and why, they are almost inescapably influenced to some extent by that anticipated annoyance."). I agree with the majority and Judge Brasher's concurrence that, at least in cases implicating a

juror's ability to decide a case based on the facts and the law, an intrusive investigation should be rejected.[6]

We can rule out the second option in cases like this as well. Removing a juror or taking the drastic measure of declaring a mistrial without investigation will normally be out of the question given that the standard of proof for juror removal is demanding, and accusations of juror misconduct are not always reliable.

A third option for the district court is to allow deliberations to continue (perhaps after reinstructing the jury) without making any investigation into the juror's thought process. This is what *Brown* and *Thomas* recommend, and the majority and concurrence appear aligned in embracing this model. *See* Maj Op. at 28 ("A presiding judge faced with anything but unambiguous evidence . . . need go no further in his investigation." (citing *Thomas*, 116 F.3d at 622)); Brasher Conc. Op. at 51 ("[W]hile the jury is actively deliberating, it is never appropriate for a judge to 'inquir[e] into [a] juror's thoughts.'" (citing *Thomas*, 116 F.3d at 620)).

I agree that the *Thomas* model rightfully cautions district courts about intervening in deliberations. As Judge Brasher says, letting "deliberations play out," and letting "one juror convince another that he is wrong," should be the

---

[6] A more probing investigation will often be appropriate where the district court can investigate without inquiring into jurors' thought processes—for example, a complaint of bribery, intoxication, or a juror's unexplained absence. *E.g., United States v. Wilson*, 894 F.2d 1245, 1251 (11th Cir. 1990) (holding that the district court had a duty to sufficiently investigate a juror's absence before excusing the juror).

"default response." Brasher Conc. Op. at 51. But when allegations of misconduct arise, they must be investigated.[7] These two principles sometimes come in tension, *Thomas*, 116 F.3d at 616, and while both the majority opinion and Judge Brasher's concurring opinion would follow *Thomas* in resolving that tension in favor of protecting the secrecy of deliberations, I worry about the consequences of a rule that ties the hands of district judges when they are alerted to potential misconduct.

A rule that stops the investigation when the judge is "faced with anything but unambiguous evidence," *see* Maj Op. at 28, will usually stop the investigation before it starts—or at least before it uncovers the truth. When a district judge is tipped off that something is amiss in deliberations, the initial information will rarely be unambiguous. Most often, as here, a juror will send a communication that merely raises the possibility that another juror is refusing to decide the case according to the court's instructions.[8] *See, e.g.*, *Abbell*, 271 F.3d at 1302;

---

[7] While Judge Brasher's concurrence suggests that we can distinguish this case from those involving real complaints of "misconduct," it is not clear what legal principle would justify such a distinction. Misconduct in this context does not imply malice or bad faith; it simply refers to any "action by jurors that is contrary to their responsibilities." *United States v. McGill*, 815 F.3d 846, 866 (D.C. Cir. 2016) (per curiam) (citing 6 Wayne R. LaFave et al., *Criminal Procedure* § 24.9(f) (4th ed. 2004)). So when the court becomes aware of comments in deliberation suggesting a juror may be deciding the case on impermissible grounds, there is potential misconduct to investigate. That is true whether the comment refers to a decision potentially based on a divine directive, as here, or one potentially based on "internal beliefs and feelings," *Augustin*, 661 F.3d at 1129. In such a case, the court will not immediately know whether misconduct has occurred. It will know only of *potential* misconduct and will have to investigate to determine whether the juror is following the court's instructions.

[8] There have been occasional exceptions. *See United States v. Geffrard*, 87 F.3d 448, 451 (11th Cir. 1996) (reviewing dismissal of juror who herself wrote to the judge that her religious

81

*Augustin*, 661 F.3d at 1129; *Thomas*, 116 F.3d at 609–10; *accord United States v. Boone*, 458 F.3d 321, 323–24 (3d Cir. 2006); *United States v. Symington*, 195 F.3d 1080, 1083 (9th Cir. 1999); *United States v. Ginyard*, 444 F.3d 648, 650 (D.C. Cir. 2006). At that point, the record will be ambiguous, and the *Thomas* model would say that the investigation (which has not yet begun) need not continue. 116 F.3d at 622.

I am concerned that this model—particularly when combined with the majority's holding—creates a Catch-22 for district courts. In order for a juror's removal to be affirmed on appeal, the district court must develop a record that will unambiguously support that decision. Maj. Op. at 27–28. Of course, as the majority recognizes, "a juror might *say* that he is deliberating and explain his decision-making in terms of the evidence, when he is in fact not following the jury instructions." *Id.* at 32. Yet in the majority's view, the district court cannot make a credibility determination about whether to accept the juror's assertion unless there is a separate factual foundation for rejecting the testimony. *Id.* And how would the court establish such a foundation? The majority refers us to cases in which the district court "confirm[ed] with all other jurors that the suspect juror was

beliefs prevented her from deciding the case fairly); *accord United States v. Wilkerson*, 966 F.3d 828, 832–33 (D.C. Cir. 2020) (reviewing dismissal of juror who herself wrote that she could not be fair because she was distressed and disagreed with the law). But even in these cases, the court interviewed the juror before determining that dismissal was appropriate. It was not "unambiguous" that dismissal was appropriate until the court inquired into how the juror was deliberating.

refusing to deliberate or base her verdict on the evidence and the law alone." *Id.*

At the same time, the majority warns against this type of invasive inquiry. *Id.* at

28. There is no need to talk with other jurors, we are told, when the judge is faced

with an ambiguous record. *Id.*

As one of our colleagues now in the majority pointed out at oral argument,

this means that a juror must only say the "magic words" in order to "insulate"

herself from removal. *See* Oral Argument Recording 16:42–17:15 (February 23,

2021). *Thomas* recognized this fundamental flaw, but ultimately shrugged it off as

"an imperfect rule, no doubt, but one fully consistent with our history and

traditions, in which the judge's duty and authority to prevent nullification and the

need for jury secrecy co-exist uneasily." 116 F.3d at 622.

Worse than "imperfect," this is intolerable. *Thomas* itself tells us why,

recounting "numerous and notorious examples" of jurors disregarding the law,

particularly in our own former circuit. *See id.* at 616 (referring to examples

including "the two hung juries in the 1964 trials of Byron De La Beckwith in

Mississippi for the murder of NAACP field secretary Medgar Evers, [and] the

1955 acquittal of J.W. Millam and Roy Bryant for the murder of fourteen-year-old

Emmett Till"—what *Thomas* called "sabotage[s] of justice" and "shameful

examples of how nullification has been used to sanction murder and lynching").

Similarly, the Supreme Court recently reminded us of a history of lawless jury

83

verdicts, again in our own former circuit. *See Peña-Rodriguez*, 137 S. Ct. at 867. These outcomes, the Court said, "challenged the American belief that 'the jury was a bulwark of liberty.'" *Id.*

Let me pause here to emphasize that what happened in this case is nothing like the ugly history of juror nullification that the Supreme Court and the Second Circuit described. By all accounts, Juror No. 13 was earnest and sincere. Given the circumstances of this case, a hands-off approach might seem attractive as a rule going forward. Our history, however, should remind us that while juror secrecy is of great importance, so is ensuring that juries render verdicts anchored in the facts and the law. *See id.*; *Thomas*, 116 F.3d at 616. The latitude given to district courts to investigate complaints like this one should balance these two objectives.

To be sure, a more stringent prohibition on judicial investigation makes sense *after* a verdict is rendered. Post-verdicts inquiries must be more limited because they undermine the "stability and finality" of verdicts. *Peña-Rodriguez*, 137 S. Ct. at 865. There is also less need for investigation post-verdict because concerns such as juror impartiality can be raised and investigated *before* a verdict is rendered. *See id.* at 878 (Alito, J., dissenting); *Warger v. Shauers*, 574 U.S. 40, 51 (2014). But when complaints arise during deliberations, creating a possibility that a decision is being made on impermissible grounds, district courts cannot turn a blind eye.

That is why I believe the district court's approach—a limited investigation—strikes the right balance. The district court first spoke with Juror No. 8 who raised the initial complaint. Based on that interview, the court determined that it was necessary to interview Juror No. 13 to determine whether he was deliberating as the court instructed. But the court ensured that its investigation was no more intrusive than was necessary. Prior to the colloquies with Jurors No. 8 and 13, the district court cleared the courtroom to preserve anonymity and to shield the jurors from public scrutiny. The court resisted calling the foreperson or interviewing all twelve jurors. And when speaking with Jurors No. 8 and 13, the court avoided inquiring any more than necessary into the nature of deliberations.

In this way, the district court conducted a narrow inquiry that gathered enough information to determine whether there was a substantial possibility that Juror No. 13 was following the court's instructions. This careful approach was no abuse of discretion; it was exactly what we should ask of district courts when a complaint of juror misconduct arises.

## III. Affirming the District Court Would Uphold the Principle That Jury Verdicts Must Be Evidence-Based

To state the obvious, this case has stirred passions. Understandably so. In the foreground of the majority's opinion is the assertion that Juror No. 13's dismissal undermines the Sixth Amendment's right to a unanimous jury verdict. And in the background of this appeal has been the notion that the district court's

ruling would invite discrimination against people of faith.[9]  Yet neither characterization accurately portrays the district court's determination—or its consequences for that matter.  By carefully investigating, and acting upon its best understanding of the evidence, the district court fulfilled its responsibility to "protect each party's right to receive a verdict rendered by a jury that follows the law."  *See Brown*, 947 F.3d at 670 (alteration rejected) (quoting *Kemp*, 500 F.3d at 304).  Doing so fortifies the Sixth Amendment and does not invite discrimination against religious jurors.

## A.     Affirming the District Court Would Bolster Sixth Amendment Protections

Juror removal is a two-sided coin.  The "good cause" standard governs juror removal, Fed. R. Crim. P. 23(b)(3), regardless of whether a juror is entrenched in an "acquit" or "convict" posture.  We have rightfully interpreted the good cause standard to be "tough" enough to protect a defendant's right to a unanimous jury verdict when the juror in question is inclined to acquit.  *Abbell*, 271 F.3d at 1302.

---

[9] Maj. Op. at 46 (warning that "[w]e must guard against the removal of a juror who [speaks] in vernacular commonly used by religious and racial minorities"); *Brown*, 947 F.3d at 710 (Pryor, J., dissenting) ("In short, the majority's opinion creates more mischief than it manages and sets the groundwork to deprive many sincere, religious citizens of one of 'the most substantial opportunit[ies]' they 'have to participate in the democratic process.'"); Appellant's En Banc Brief at 45 (arguing that "by inviting courts to police the manner in which jurors express their religious beliefs and experiences, the [district] court's decision risks excluding from jury service large swaths of the population who use vivid, direct, and personal expressions to convey their experience of prayer and divine guidance"); *id.* at 45–47 (warning that "many devout religious believers, would not use expressions as vivid as Juror 13's to convey their experience of divine guidance . . . for fear of ridicule by secular elites," and that those who do not self-censor would be disqualified from jury service under the district court's approach).

But the standard cannot be so onerous as to insulate from removal a juror who would convict for reasons other than the merits of the case.

It is axiomatic that "[i]n a pluralistic America, the jury room must remain a place of common ground firmly rooted in law, irrespective of deeply and sincerely held religious differences." *Robinson*, 444 F.3d at 227 (Wilkinson, J., concurring in the denial of rehearing en banc). This principle flows directly from the Sixth Amendment right to a fair trial by "impartial, indifferent jurors." *Id.* at 226 (internal quotation marks omitted); *see Turner*, 379 U.S. at 472 ("The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[A] verdict must be based upon the evidence developed at trial.").

It has been said in the death penalty context that "[a] defendant must never suspect that he was sentenced to death on the basis of religious dictate, especially if the jury's religious beliefs are not his own." *Robinson*, 444 F.3d at 227 (Wilkinson, J., concurring in the denial of rehearing en banc). Neither should a defendant ever suspect that he was convicted on such a basis. For all the majority's talk about safeguarding the Sixth Amendment, today's ruling moves us farther from—not closer to—upholding that right.

87

A hypothetical posed at oral argument brings this point to life.  Imagine that instead of saying "the Holy Spirit told me Corrine Brown is not guilty," Juror No. 13 said "Satan told me that Corrine Brown is guilty on all charges."  *See* Oral Argument Recording at 10:03–10:50 (February 23, 2021).  Assuming this hypothetical otherwise mirrored our case, Brown acknowledged that the result would have to be the same as here—the juror would have to remain, even if the district court found, based on its inquiry, that the juror was not capable of deciding the case as instructed.  *Id.* at 10:50–10:57; 13:06–13:34.  That answer is as telling as it is unsettling.  It shows that allowing wide latitude for jurors to base decisions on something other than the law and the evidence—and restricting district courts from policing such issues—will imperil Sixth Amendment rights by opening the door to arbitrary verdicts.

No system we can engineer will be perfect.  But the one we should strive for, and the one that will best protect Sixth Amendment rights, is one that instills confidence that verdicts will be anchored in the facts and the law.  If a complaint surfaces during deliberations, district courts should have discretion to inquire, just as the court did here.  And if the court determines as a matter of fact that there is no substantial possibility that the juror is rendering a decision based on the merits, we should review that finding deferentially.  Doing so would bolster Sixth Amendment protections—not weaken them.

### B.    Affirming the District Court Would Not Invite Discrimination Against Jurors Who Speak in Religious Vernacular

Among the criticisms levelled against the district court is that it misconstrued Juror No. 13's religious expression by classifying divine guidance as an external force. This view of divine guidance, the majority suggests, would "deny the implements of faith to people when they need them the most." Maj. Op. at 39. Citing a wealth of theological authority, the majority emphasizes that prayer is widely experienced as "an internal mental event" rather than a form of "external instruction." *Id.* at 42. In light of this distinction, the majority says that Juror No. 13's "vivid and direct religious language" reflected his internal deliberative process rather than the influence of an external source. *Id.* at 40, 42–45.

I do not question the majority's depiction of how many people have described prayer. But neither do I view this "internal" versus "external" distinction as central to deciding this appeal. In instances like this, a district court's job is not to make any theological determination about the nature of prayer. The task is simply to determine whether the juror in question is performing his duty as instructed by the court. The government cites examples of courts performing a similar task in voir dire without delving into the nature of prayer itself. *United States v. Snarr*, 704 F.3d 368, 380 (5th Cir. 2013) (affirming a district court's dismissal of a potential juror who was opposed to the death penalty but said she could impose it "'if the Holy Spirit was guiding her' to do so"); *State v. Taylor*,

774 S.W.2d 163, 166 (Tenn. 1989) (affirming dismissal of a potential juror who opposed the death penalty and "would consider imposing [it] 'only if the Holy Spirit directed [her] to go that direction'").

Whether one views divine revelation as an internal or external phenomenon, the question for courts is the same: Can the juror base her decision on the evidence at trial and the law as the court instructs? *See Abbell*, 271 F.3d at 1302. In this case, the district court determined that Juror No. 13 could not. I would not second-guess that determination based on claims, however accurate, about the way many people experience prayer.

Nor do I see any evidence that affirming the district court in this case would have opened the door to preventing religious people from serving as jurors or forcing them to become different people in the jury room. *See* Maj. Op. at 39. As long as jurors have been called to sit in judgment of their fellow citizens, many have relied on prayer to aid them in that task. Many will continue to do so, and no one here has advocated anything different. It is no attack on people of faith for a district court to ensure that jurors make decisions grounded in the law and the evidence, as our Constitution requires. I respectfully dissent.

90

ROSENBAUM, Circuit Judge, joined by WILSON and MARTIN, Circuit Judges, dissenting[1]:

## I.

Every judge of this Court agrees on this much: the same rule governs dismissal of both the juror who says his religious authority told him the defendant is not guilty on all charges and the one who says his religious authority told him the defendant is *guilty* on all charges. So let's be clear about what we're really doing today: we are holding that a district judge is powerless to dismiss a juror who, on a record like this one, says the Holy Spirit told him the defendant is *guilty* on all charges and he trusts the Holy Spirit—even though the judge finds after investigation that the juror is not capable of basing his guilty verdict on the evidence but instead will base his verdict on what he perceives to be a divine revelation.[2] Just think about that. We are prohibiting district judges, on records like this one, from dismissing

_____

[1] I fully agree with Judge Wilson's excellent Dissent and join it in its entirety. I write separately only to emphasize a few points.

[2] To put it in even starker terms, at oral argument, Judge Jordan asked Brown's counsel whether the rule the Majority Opinion adopts today would also prevent the district judge from dismissing a juror who, on a record like this one, says that Satan told him the defendant is *guilty* on all charges and he trusts Satan—even if the judge finds after investigation that the juror is not capable of basing his guilty verdict on the evidence but instead will base it on what he thinks is a Satanic revelation. Brown's counsel conceded the rule would preclude the juror's dismissal. And not a single judge of this Court disagrees; the same rule must govern whether the juror says he's told by the Holy Spirit or by Satan and whether he says he's told the defendant is not guilty or guilty on all charges.

jurors they find beyond a reasonable doubt will return a *guilty* verdict that is *not* based on the evidence.  Why bother with the trial?

Yet while the Majority Opinion guarantees this result, it invokes the grandeur of the right to a jury trial, ironically dedicating an entire section to how its decision protects the rights of defendants to unanimous jury verdicts.  *See* Maj. Op. at Section III.A.  But a unanimous jury's guilty verdict is worth less than nothing to a convicted defendant if the jurors who returned the verdict did not base it on the evidence.  And even if only a single juror voted guilty because he believed his religious authority instructed him to do so, without regard to the evidence, the guilty verdict of the jury he sat on is not the unanimous verdict our Founders and the Constitution contemplated;  in that case, at best, only eleven jurors, not twelve, based their verdict on the evidence presented at trial.  *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020) ("A verdict, taken from eleven, [is] no verdict at all.") (internal quotation marks omitted).  So though the Majority Opinion's take on the Sixth Amendment right to a unanimous jury verdict may leave a reader with the impression that our decision today is a soaring eagle, that is but an illusion.  Today's decision is in fact a skulking serpent:  it dooms the Sixth Amendment right to a unanimous jury verdict in at least some critical circumstances—namely, when a jury returns a *guilty* verdict not unanimously based on the evidence.

92

Bedrock to our trusted jury system, a juror's deliberations and "verdict must be based upon the evidence developed at the trial[.]" *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (same). That "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472. Due process also demands "a jury capable and willing to decide the case *solely* on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982) (emphasis added).

So when a district judge who identifies the correct standard and conducts a thoughtful colloquy with a juror concludes as a factual matter, beyond a reasonable doubt, there is no substantial possibility that juror will base his verdict on the evidence—and the record may fairly and reasonably be viewed to support the judge's determination—the judge must be permitted to dismiss that juror. Both the right to a verdict based on the evidence and the right to a unanimous jury verdict depend on it. And the public's continued acceptance of jury verdicts, in turn, depends on its security in knowing that our courts will not tolerate jurors who return verdicts based on something other than the evidence.

I am not suggesting that complete deference to district judges without regard to the record is appropriate. But as Judge Wilson explains in his Dissent, *see* Wilson

93

Op. at 58-61, the Majority Opinion entirely reads out of the *Abbell* standard of review any recognizable version of clear-error review. In its place, the Majority Opinion imposes a standard of review that looks for only evidence that can be construed as any kind of ambiguity in the record. *See* Maj. Op. at 26 ("[W]e require that only an unambiguous record may withstand reversal."). And if a record contains any evidentiary ambiguity at all, the district judge is constrained to leave a juror in place—even if the district judge, with the benefit of personal observation of and interaction with the juror, finds beyond a reasonable doubt that there is no substantial possibility that the juror will base his verdict on the evidence adduced at trial. *See id.* For if he dismisses the juror, we necessarily must now reverse him. *See id.* That is not clear-error review under any definition of the phrase. And it does not defer even a little bit to the district judge's factual findings that a juror—even a "sincere" and "earnest" one—is not capable of deciding a case based on the evidence.

District judges are on the front lines during jury trials. They interact directly with the jurors; observe them every day of trial; and when a juror challenge arises, personally assess that juror. We do not. We sit (often hundreds of) miles away in our quiet offices, reading cold, lifeless transcripts months (or years) after the fact. We never interact with the challenged juror, never watch his demeanor as he responds to questions or listens to evidence, never hear his intonation, and never so much as observe him in person at all. For these reasons, we have emphasized time

94

and time again the importance and common sense of deferring to district judges' factual findings unless they are clearly erroneous.  *See*, *e.g.*, *United States v. Sammour*, 816 F.3d 1328, 1339 (11th Cir. 2016) ("We have no basis to overturn [the district court's] finding:  the 'cold record' does not reveal the inflections in Juror 9's voice or her demeanor as she answered the questions."); *United States v. Bradley*, 644 F.3d 1213, 1279 n.114 (11th Cir. 2011) ("We understand that the bare record of juror Smith's colloquy with the court could be construed to mean that the jury had already determined the defendants' guilt and were not willing to engage in objective deliberations;  indeed, many of Smith's answers to the court's questions imply exactly that.  We cannot, however, discount the possibility that juror Smith's demeanor and bearing gave the court a distinctly different impression.  Owing to the potential for this equally-probable interpretation of juror Smith's comments, we defer to the district court's factual determination that the jury remained impartial."); *Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir. 1983) ("Appellate courts reviewing a cold record give particular deference to credibility determinations of a fact-finder who had the opportunity to see live testimony."); *United States v. Abbell*, 271 F.3d 1286, 1303 (11th Cir. 2001) (applying clear-error review in juror-dismissal cases); *see also Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984) ("The manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen below, but cannot always be spread upon the

record.  Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.") (cleaned up).

The Majority Opinion's decision today not to abide by clear-error review has grave consequences.  Based on today's decision, district judges will be more reluctant than ever to inquire at all into potential juror misconduct.  So potential juror misconduct will be more likely to go unchecked.

And even if a district judge bucks the trend and conducts some investigation, as long as the challenged juror who says the Holy Spirit (or Satan) told him the defendant is guilty on all counts also says that he is basing his verdict on the evidence, the district judge will not be able to dismiss him.  When the jury unsurprisingly later returns a guilty verdict, the defendant will have no recourse: Rule 606(b), Fed. R. Evid., precludes any inquiry into "any statement [a juror] made or [any] incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1).  And since the Majority Opinion concludes today that Juror 13's statement that the Holy Spirit told him that Brown was not guilty (or guilty) on all charges did not result from an "outside influence," Fed. R. Evid. 606(b)(2)(B), Maj. Op. at 40-41, there will be no possibility that a court facing a similar remark by a juror will be able to inquire into whether that juror

96

(or multiple jurors) rendered a verdict because he (or they) thought he (or they) had a divine (or Satanic) revelation and without regard to the evidence.

## II.

I feel compelled to comment on one more aspect of the Majority Opinion. To the extent that some of its points may be misunderstood as suggesting that this Court views religious jurors as inherently trustworthy or more trustworthy than nonreligious jurors,[3] it's important to state plainly that that is not the case.

For starters, whether Juror 13 lied has never been at issue here: indeed, as the Majority Opinion emphasizes, the district court found that Juror 13 likely believed what he told the judge but that he nonetheless was not capable of basing his verdict on the evidence despite his intent to do so. Second, any suggestion either that religious jurors are inherently trustworthy or that they are more trustworthy than nonreligious jurors would be problematic. Of course, I do not mean to suggest that religious jurors are not trustworthy or are less trustworthy than nonreligious jurors. But judges should not have preconceived notions about any juror's credibility—

---

[3] *See* Maj. Op. at 40 (stating "it is more than reasonable to doubt that a religious juror would have lightly violated his oath" and citing sources for the propositions that "the phrase '[so] help me God' invokes 'God's vengeance' when a juror does not 'fulfil [his] engagement to speak the truth, or perform the specific duty'"; "'So help me God' is shorthand for 'So may God help me at the judgment day if I speak true, but if I speak false, then may He withdraw His help from me'"; "'the use of the words "So help me God" in the juror's oath' means that 'the juror will, as God is his witness, decide the issues according to the evidence.'") (alteration in the original) (citations omitted).

whether the juror is religiously devout or not.   Rather, judges must make credibility judgments on an individual juror's testimony and demeanor.

## III.

A unanimous guilty verdict that is not based on the evidence is not a unanimous jury verdict within the meaning of the Sixth Amendment right.   We should not require district judges in this Circuit to be complicit in guilty verdicts of that type by rendering the judges impotent to remove jurors who, despite good intentions, are not capable of returning a verdict based on the evidence.   Because today's decision nonetheless ensures this result, I respectfully dissent.